In the Matter of SIERRA TRADING CORPORATION, Debtor.

BUTTES GAS & OIL COMPANY et al.,
Petitioners-Appellants,

v.

L. W. WINKLER, Jr., Trustee in Bankruptcy, Trustee-Appellee.

No. 72-1582.

United States Court of Appeals,
Tenth Circuit.

July 12, 1973.

---

**334**

Raymond J. Gengler, Denver, Colo., for petitioners-appellants.

James A. Clark, Denver, Colo., for trustee-appellee.

Before PHILLIPS, SETH, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is an appeal from the district court's order and judgment upholding the referee in bankruptcy's order which in turn disallowed claim No. 221 filed by Buttes Gas & Oil Company and others, hereinafter referred to as the claimant, against Sierra Trading Corporation, the debtor corporation, in a Chapter X Reorganization. This particular claim was based on a letter agreement entered into by the parties on September 3, 1969, and the narrow issue here to be resolved is whether the payment called for by that letter agreement is a "penalty" or "liquidated damages."

The parties to this proceeding are in apparent agreement that if the payment called for by the letter agreement be truly one for liquidated damages, then the claim should be allowed; but that if the payment provision be not truly one for liquidated damages, but one in the nature of a penalty, then the claim should be disallowed. As indicated, the referee concluded that the claim was not truly one for liquidated damages, but was instead in the nature of a penalty, and accordingly disallowed the claim. On review, the district court affirmed the order of the referee. The claimant now appeals. We affirm.

The claimant and the debtor corporation, along with others, were interested in the oil and gas drilling operations being conducted on certain lands located in Weston County, Wyoming, the particular area being described as the Mush Creek Extension Unit. The total daily production from all leases in the field prior to unitization was approximately 80 barrels a day and was said to be continually diminishing. Studies showed that the area had possibilities as a secondary water recovery program and that with the injection of controlled amounts of water into the oil bearing formation and proper operation of the related facilities the recovery of oil might be increased on a daily basis, as well as with respect to the total ultimate recovery.

It was in this setting that on September 25, 1968, claimant and the debtor corporation, along with other parties not here concerned, entered into a Unit Agreement for the development and operation of the Mush Creek Extension Unit by secondary water recovery methods and contemporaneously therewith entered into a so-called Unit Operating Agreement. Pursuant to the applicable terms of these agreements, each owner agreed to pay its designated share of the costs attendant to the unit operations, which in the case of the debtor corporation was approximately 54%. In addition, the agreements provided that in the event of a default by any working interest owner with respect to the obligation to pay his share of the total cost of unit operations, the nondefaulting owners should have the right to the interest in the lease and runs of the defaulter "up to the amount owing."

Approximately one year later this latter provision was amended by a so-called "letter agreement" dated September 3, 1969. This letter agreement provided that in the event of a default in payment by a working interest owner, the defaulter, after notice, should relinquish his interest in the lease and runs until the nondefaulters had been paid 200% of the costs and expenses which they had themselves paid on behalf of the defaulter.

The debtor corporation became in arrears in the payment of its share of the unit operation expense, and the claimant paid $127,851.87 on behalf of the debtor corporation. A petition was later filed by the debtor corporation for a Chapter X Reorganization, and the claimant filed two separate claims in that proceeding. Claim No. 220 was for the $127,851.87 actually advanced by the claimant in behalf of the debtor corporation. Claim No. 221 was also for $127,851.87, representing the additional 100% assessment sum called for by the letter agreement of September 3, 1969, in the event of a default.

Claim No. 220, representing the actual outlay of money made by the claimant on behalf of the debtor corporation, was allowed in full and, it being a lien on the debtor corporation's runs, will be paid in full. However, as indicated, the referee, after hearing, denied Claim No. 221, and in so doing found and concluded that the "100% liquidated damages provision in the letter agreement dated September 3, 1969, is disproportionate to the risk and actual damages that might have been contemplated at the time the letter was signed and accordingly, the amount of damages should be limited to the actual damages which is the amount in Claim No. 220."

The district court in its review of the matter stated that the "decision in any case [of this nature] will depend upon the facts of that case" and went on to conclude that the facts of the instant case, "including the specific contractual provisions, the project being undertaken and the damages which could have been anticipated, give more than ample support to the conclusion of the referee." It was on this general basis that the district court affirmed the order of the referee.

The Restatement of Contracts, § 339(1) (1932) reads as follows:

"An agreement, made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless

(a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and

(b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimation."

In general accord with the foregoing is our case of Jones v. Dickens, 394 F.2d 233 (10th Cir. 1968). Therein appears the following pertinent comment:

"* * * [B]efore an agreement [for liquidated damages] may be enforced * * * it must appear that the damages to be anticipated were uncertain in amount or difficult to be proved; that the parties intended to liquidate them in advance, and that

the amount stated is a reasonable one not greatly disproportionate to the presumed loss or injury. * * *"

■ The claimant's position in this court is that under the circumstances the referee, as a matter of law, was compelled to find that the 200% provision was a liquidated damage provision. We do not regard the issue before us to present a question of law. Rather, it is a fact issue, or, perhaps, a mixed question of fact and law. Though the evidence before the referee was not in dispute, and was largely documentary in nature, certainly the inferences to be drawn from the evidence were matters upon which reasonable minds could well differ. In such instance the referee's findings may not be overturned on review, by either the district court or us, unless such be clearly erroneous. Moran Bros., Inc. v. Yinger, 323 F.2d 699 (10th Cir. 1963); Washington v. Houston Lumber Company, 310 F.2d 881 (10th Cir. 1962). We agree with the district court that the referee's order finds support in the record and is not clearly erroneous and should therefore be affirmed. ·

The main thrust of the claimant's argument is that the courts in general have been more prone than they might otherwise be to find liquidated damages in contracts involving oil and gas leases because of the inherent difficulty or impossibility of establishing resultant damage from the "failure to drill and develop an oil and gas lease." Claimant asserts that both the referee and the district court ignored this aspect of the case. We do not believe that this line of argument really stands up when the several contracts between the parties are closely scrutinized, and in any event would in nowise be binding on the referee.

As we read the unit agreements and particularly the letter agreement of September 3, 1969, a nondefaulting owner would recover nothing from a defaulting owner unless the former in one form or another made an actual advance on behalf of the defaulter. And then his recovery would apparently be from the actual runs which would otherwise belong to the defaulting party. Such suggests to us that the parties contemplated that the secondary water program would be completed one way or the other, i. e., if one owner defaulted, the other owners would advance the defaulter's share of the expense.

In this same vein, in the letter agreement of September 3, 1969, there was the declaration that the "undersigned, being all or part of the owners of the Working Interests, * * * fully realize that it would be to their advantage if the operator, if he sees fit, proceeds with the operations even if the advancements have not been made." While it is true that the operator could, if he saw fit, discontinue secondary recovery operations, it nevertheless appears to us that it was the clear intent of the parties that the secondary recovery program would be completed, even if certain parties did not pay their share of the costs as represented by periodic billings from the operator. And, as we understand it, the secondary recovery program was in fact never abandoned because of the default of the debtor corporation. So, the difficulty of determining resultant damage should the secondary recovery program have been abandoned because of the failure of an owner to pay his share of the expense is not really in the case, because the parties contemplated that the secondary recovery program would in fact be completed even though one party might be in default. It was in this setting that the referee found that the double recovery was "disproportionate to the risk."

In this regard, the referee also noted that we are not here concerned with the initial drilling of an oil well in a field of undetermined potential, but rather with a secondary recovery program in a field where the prior amount of production was a known factor.

■ Although we do not attach great significance to it, we note, as did

the district court, that the claimant in its billings to the debtor corporation referred to the 200% provision as a "penalty." Such characterization is of course not binding on the claimant. It may only have been a layman's incorrect use of a legal word of art. On the other hand, it may coincidentally have been a correct choice of words. In any event, the weight to be given such evidence is not a matter for a reviewing court.

All of the aforementioned factors illustrate why we are of the firm view that the issues here presented are not those involving questions of law, but are issues of fact. True, as indicated above, the evidence before the referee was essentially documentary in nature, i. e., the several contracts between the parties, written correspondence, and the like. However, the inferences to be drawn from such documentary evidence were ones upon which reasonable minds could well differ. Nevertheless, the inferences drawn by the referee were in our view reasonable and find logical support in the record and under the circumstances his findings should not be disturbed by us on appeal.

Therefore, the judgment is affirmed.