NISSHO–IWAI CO., LTD., Plaintiff,

v.

M/T STOLT LION, her engines, boilers, etc., Anglomar Supertankers, Limited, and Parcel Tankers, Inc., Defendants,

Anglomar Supertankers, Limited, Defendants-Appellees,

and

Parcel Tankers, Inc., Defendant-Appellant.

No. 31, Docket 83–7235.

United States Court of Appeals, Second Circuit.

Argued Sept. 7, 1983.

Decided Oct. 3, 1983.

Chester D. Hooper, New York City (Keith L. Flicker, M.E. DeOrchis, Haight, Gardner, Poor & Havens, New York City, of counsel), for defendant-appellant Parcel Tankers.

Stephen P. Kyne, New York City (Burke & Parsons, New York City, of counsel), for defendants-appellees M/T Stolt Lion and Anglomar Supertankers.

Before MANSFIELD and PRATT, Circuit Judges, and TENNEY, Senior District Judge.*

MANSFIELD, Circuit Judge:

Parcel Tankers, Inc. (Parcel), a shipper's assignee seeking damages from a carrier, Anglomar Supertankers, Limited (Anglomar), for alleged discoloration of a cargo of styrene monomer shipped by its assignor, Nissho-Iwai Co., Ltd., aboard Anglomar's vessel M/T Stolt Lion, appeals from a judgment of the Southern District of New York. The judgment was entered after a non-jury trial before Judge Gerard L. Goettel, who dismissed Parcel's complaint on the ground that Parcel had failed to make out a prima facie case. We reversed an earlier judgment in favor of Anglomar because the district judge had imposed an excessive burden of proof on Parcel. *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion, et al.*, 617 F.2d 907 (2d Cir.1980). We also reverse the present judgment for the reason that as a matter of law the evidence satisfies Parcel's burden and Anglomar as carrier has failed to show that it was free from negligence with respect to the cargo.

Since certain material undisputed facts are set forth in our prior decision, we need not dwell upon them at length here. The cargo (1,500 tons of styrene monomer) was delivered in good condition by the shipper, Nissho-Iwai Co., Ltd., to the No. 8 tank of the carrier's ship, M/T Stolt Lion, at Texas City, Texas, for carriage to Yokohama, Japan. The relations between the parties were governed by the U.S. Carriage of Goods by Sea Act, 46 U.S.C. §§ 1300, *et seq.* (COGSA). The ship, owned and manned by Anglomar, had been time-chartered by it to Parcel, which later succeeded by assignment to the shipper's cargo damage claim.[1]

The cargo damage claim is based on evidence that, although the styrene was delivered to the carrier in good condition, it was found to be discolored shortly after discharge on November 16, 1973, from the

---

\* Of the United States District Court for the Southern District of New York, sitting by designation.

1.  Parcel settled for $70,000 the claim asserted against it by the shipper, Nissho-Iwai Co., Ltd., taking an assignment of Nissho's claim in the sum of $177,633 plus interest against Anglomar. Parcel had earlier asserted a cross claim in the action against Anglomar, demanding that if the shipper be found to have suffered damage as alleged in its complaint Parcel should have judgment therefor against Anglomar.

Stolt Lion into the shipper's coastal tanker Kyokuho Maru near Yokohama. The case was originally bench-tried upon a record consisting (except for one live expert witness who testified briefly) of deposition transcripts and documents. *Nissho-Iwai Co., Ltd. v. M/T Stolt Lion, et al.,* No. 77 Civ. 716 (S.D.N.Y. April 30, 1979). The district judge, laboring under the understandable but erroneous assumption that Parcel had the "burden of proving fault on the part of the owner [Anglomar]," *id.* at 6, focused his attention mainly upon evidence received "as to the cause of the contamination." *Id.* at 2. It was undisputed that when discharge began on November 16 the styrene was clear. However, from 4:45 P.M. to 5:55 P.M. pumping was suspended because the pump on the Stolt Lion was unable to continue pumping the styrene into the Kyokuho Maru due to a leaking "suet blank" that was sucking air into the pipeline. A suet blank is a pipe coupling, bolted into a gap in the pipeline, that can be opened or closed to regulate the flow of liquid. If its bolts become loose, leakage can develop and the pump can suck into the pipeline whatever foreign substance is located outside the blank (e.g., air, bilge, a different liquid) and mix it with the liquid being discharged. If sufficient air is sucked into the line the pump may be prevented from discharging the liquid cargo.

In his deposition Tetsuya Hirayama, the shipper's surveyor who was present throughout the entire discharge, testified that he had found upon inspection before any discharge that the tanks of the receiving coastal steamer Kyokuho Maru—which had transported styrene on its previous trip—were clean. However, at approximately 5:00 P.M., early in the 70-minute interruption required to repair the suet blank on the Stolt Lion, he noted upon further inspection that the styrene already pumped into the No. 4 tank of the Kyokuho Maru was slightly discolored. He testified that he called this to the attention of the Stolt Lion's Chief Officer, that he, Hirayama, then had the discolored styrene transferred from the receiving coastal steamer's No. 4 to its No. 2 tank, and that when pumping resumed after the suet blank was repaired the newly discharged styrene appeared to be clear.

Hirayama further testified that prior to the interruption of the discharge the Stolt Lion had developed a "big list," which was corrected by the time discharge was resumed. An expert witness, Arthur Steier, was of the view that the pump and suet blank had, because of the list, become immersed in black bilge which had then been sucked into the line through the leaking blank to mix with and discolor the styrene being discharged.

Hirayama's deposition testimony was disputed in part by that of Herbert Graham and David B. Sutherland, who had respectively been Master and Chief Officer of the Stolt Lion and supervised the discharge on November 16, 1973. As Anglomar's principal witnesses they denied having received during discharge any notice of discoloration of any of the discharged styrene. They both confirmed that during the discharge the Stolt Lion listed, the list ranging from 3–4 degrees (Sutherland) to not more than 6 degrees (Graham). Sutherland, who had been in immediate charge of the repair of the suet blank, confirmed that it had leaked styrene into the bilge but testified that the bilge level was below the blank at the time of repairs. At any rate, the evidence was uncontroverted that when the Kyokuho Maru arrived three days later at Yokkaichi samples were taken from its tanks and found to be discolored. Moreover, there was no evidence that anything had occurred in the three-day period to cause discoloration.

Judge Goettel concluded that, although it was "not impossible" that the discoloration was caused by listing of the Stolt Lion during discharge, which might have caused the leaking suet blank to suck dirty bilge water into the line and mix with the styrene being discharged, Parcel had failed to sustain its burden, which he defined as follows: "Parcel must prove fault in the discharge of the cargo, and not merely that the goods were found to be in a damaged condition at some subsequent time, no mat-

ter how soon." *Id.* at 7. We reversed this decision on the ground that Parcel was not required to prove fault on the carrier's part; as the shipper's assignee Parcel was entitled to make out a prima facie case by showing that the styrene was delivered in good condition to the carrier and discharged in discolored condition. 617 F.2d at 912.

However, we remanded the case for further fact findings because the district judge had taken a somewhat ambivalent position on the crucial question of whether the cargo was discolored on discharge. For example, in his first decision Judge Goettel had found as follows:

> "During pumping into [the Kyokuho Maru] . . . problems developed which required the pumping to be stopped. *While repairs were being conducted on the pumps* it was discovered that some of the styrene monomer already unloaded and aboard the second coastal tanker had discolored.
>
> \* \* \* \* \* \*
>
> "The owner . . . believes that the most likely possibility was that the contamination occurred after the styrene was in the tanks of the coastal vessel. All of the evidence in this regard, however, was that the vessel's tanks were clean and could not have caused contamination." (Emphasis added). *Id.* at 1, 3.

These findings, of course, supported Parcel's contention that at least some styrene was discolored upon discharge, since the discoloration of the styrene already unloaded was discovered during an hour's interruption of the discharge, immediately after some of the styrene had been pumped out of the Stolt Lion into clean coastal steamer tanks. On the other hand, the judge stated elsewhere in his opinion that Parcel had not proved "that the discoloration existed at the time the cargo was discharged."[2] *Id.* at 6.

Given these conflicting findings, we felt that a remand was necessary. However, in view of the district court's findings regarding the timing of the discovery of discoloration and the cleanliness of the receiving vessel we anticipated that upon remand the court would, absent further evidence, conclude that Parcel had made out a prima facie case. The burden therefore would have shifted to Anglomar to introduce rebutting evidence and/or proof of its freedom from fault with respect to the discoloration. In remanding we confirmed by supplemental order that Anglomar was on remand to be given the opportunity to offer evidence that it was free from negligence and that the cargo was not damaged on discharge.

Upon remand the parties conducted additional discovery, including further depositions of Hirayama, Graham, Sutherland (by telephone) and K. Hontani (a chemical surveyor employed by Nissho), which were received in evidence. In an extensive three-day examination Hirayama confirmed in detail his earlier testimony. Efforts were made to impeach his testimony by bringing out that, although he testified to taking samples of the styrene discharged into the Kyokuho Maru, he had not furnished samples to the Stolt Lion's Chief Officer and no analysis of such samples was later furnished to the parties. Nor had he upon making the discovery given written notice of the discoloration to the Stolt Lion or noted it in his After Discharge Certificate. Hirayama's explanation was that he did orally advise the parties on the spot, that he did not realize that a slight discoloration meant that the cargo was damaged, and that, because the weather had worsened as dis-

**2.** The full text of the district court's statement is as follows:

"Parcel has conceded both that unseaworthiness at the commencement of the voyage has not been established and that there is no proof of fault in loading or caring for the cargo by the owner's servants. Consequently, any liability on the part of the owner must be premised on some error or fault in the discharge of the cargo. The weakness of Parcel's position in this regard, however, is that it assumes that the discoloration existed at the time the cargo was discharged. It has not proved this and, in fact, the evidence was quite clear that no discoloration was noted or any contamination claimed until *after* the styrene had already been discharged into the tanks of the second coastal tanker at Yokahama." (No. 77 Civ. 716 (S.D.N.Y., April 30, 1979) at 6).

charge was being completed, a quick separation of the Kyokuho Maru from the Stolt Lion was necessary to avoid damage to the ships.

The other witnesses (Sutherland, Graham and Hontani) essentially confirmed their earlier deposition testimony except that Captain Graham, who had been the Master of the Stolt Lion, gave his expert opinion that due to the Stolt Lion's poor design the contamination of the styrene monomer had happened "through one of our blanks or drain valves or something in the pump room." He also stated that because of "the amount of leakage that could occur in the pumprooms, [he] would be very much surprised if the suet blank weren't covered with liquid at some time during the cargo operation." Sutherland, who as Chief Officer of the Stolt Lion had repaired the pump, testified that it was "quite normal for the blank [being repaired] to be submerged from time to time because the level of the bilges can get quite high during discharge," that the bilge was "[d]irty, very dark," and that the leaking suet blank could have submerged during discharge because the vessel listed to port, in which event "it probably would be sucking the bilge."

The district court in its second decision, No. 77 Civ. 716 (S.D.N.Y. Feb. 28, 1983), which is the subject of the present appeal, repeated its earlier view, stating that the theory that the discoloration was caused by suction of bilge through the leaking suet blank on the Stolt Lion, "was not impossible but that there had been insufficient evidence presented to support it." While expressing doubt as to the credibility of Hirayama's testimony, mainly because of his failure to give a *written* on-the-spot notification of the problem to the Chief Officer, to take further samples and to note the discovery in his discharge certificate, the court did not reject the testimony. Instead, noting that it is "difficult, if not impossible, to assess the credibility of a witness whom you have never seen and who testified in Japanese through an interpreter at deposition," he concluded that any discoloration Hirayama saw during the interruption of the discharge "was not sufficient to satisfy Parcel's burden of establishing a prima facie case." He therefore again dismissed Parcel's complaint, and Parcel again appeals.

## DISCUSSION

The issue is whether the district court erred in concluding that Parcel had failed to prove that the cargo of styrene was discolored at discharge. Its conclusion is challenged on two grounds: (1) that it was based on erroneous findings of fact, and (2) that the district court imposed too heavy a burden upon Parcel as a matter of law. While the two issues are related, we discuss each in turn.

■ As we indicated in our earlier opinion, in order to make out a prima facie case Parcel, as the shipper's assignee, was only required under COGSA to show by a preponderance of the evidence that the styrene was discolored at the time of discharge, 617 F.2d at 912, in which event the burden would shift to Anglomar to prove by a preponderance that it was free from fault, 617 F.2d at 913. The term "preponderance" means that "upon all the evidence . . . the facts asserted by the plaintiff are more probably true than false." *Porter v. American Export Lines, Inc.,* 387 F.2d 409, 411 (3d Cir.1968) (quoting *Burch v. Reading Co.,* 240 F.2d 574, 578–79 (3d Cir.1957), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957)); see *United States v. Masiello,* 235 F.2d 279, 286 (2d Cir.1956) (Frank, C.J., concurring), *cert. denied,* 352 U.S. 882, 77 S.Ct. 100, 1 L.Ed.2d 79 (1956).

■ When a trial court makes findings of fact we will disturb them only if they are "clearly erroneous," Rule 52(a), Fed.R. Civ.P., which would occur if we "on the entire evidence [were] left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). It is true that where, as here, the essential findings are grounded on inferences drawn from a record consisting entirely of documentary evidence, we have scrutinized the

district court's findings more closely than if they had been based on its appraisal of live witnesses, reasoning that we are "in as good a position as the trial court to examine, interpret and draw inferences from testimony." *J. Gerber & Co. v. S.S. Sabine Howaldt,* 437 F.2d 580, 586 (2d Cir.1971); *Jack Kahn Music Co. v. Baldwin Piano & Organ Co.,* 604 F.2d 755, 758 (2d Cir.1979). *See, in accord, Atari, Inc. v. North American Philips Consumer Electronics Corp.,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982); *Lydle v. United States,* 635 F.2d 763, 765 n. 1 (6th Cir.1981); *Swanson v. Baker Indus., Inc.,* 615 F.2d 479, 483 (8th Cir.1980); *Taylor v. Lombard,* 606 F.2d 371, 372 (2d Cir.1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980); *cf. Marcum v. United States,* 621 F.2d 142, 144–45 (5th Cir.1980). *But see Maxwell v. Sumner,* 673 F.2d 1031, 1036 (9th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982); *United States v. Texas Education Agency,* 647 F.2d 504, 506–07 (5th Cir.1981), *cert. denied,* 454 U.S. 1143, 102 S.Ct. 1002, 71 L.Ed.2d 295 (1982); *Constructora Maza, Inc. v. Banco de Ponce,* 616 F.2d 573, 576 (1st Cir.1980); *In re Sierra Trading Corp.,* 482 F.2d 333, 337 (10th Cir.1973); *Case v. Morrisette,* 475 F.2d 1300, 1306–07 (D.C.Cir.1973). Since our function is to review questions of law, however, we prefer, when reasonably possible, to defer to the district court's findings of fact.[3]

Unfortunately this is one of the admittedly rare cases where such deference is not possible because of the district court's reluctance to make findings with respect to the credibility of key witnesses. If one accepted as credible (1) the testimony of Surveyor Hirayama that during discharge he noted a slight discoloration in the styrene just pumped from the Stolt Lion into the tanks of the Kyokuho Maru, which had been found to be clean that morning, (2) the documentary proof that three days later, with no apparent intervening cause, the styrene in these clean tanks was found to be discolored further upon arrival in Yokkaichi, (3) the testimony of the Stolt Lion's Chief Officer that the leaking suet blank on the Stolt Lion could have sucked black bilge into the styrene being pumped into the coastal steamer, and (4) the opinions of the Stolt Lion's Master and a separate expert that the contamination occurred aboard the Stolt Lion, a prima facie case would clearly be established. If, on the other hand, one rejected the deposition testimony of these witnesses as incredible, the discovery that the styrene was discolored three days after discharge, while not precluding recovery, *Socony Mobil Oil Co. v. Texas Coastal & Intl., Inc.,* 559 F.2d 1008 (5th Cir.1977) (recovery permitted where contamination of oil discovered two days after discharge), would probably be insufficient, standing alone, to make out a prima facie case.

The district court, although pointing to evidence casting doubt on the credibility of Hirayama, Sutherland and Graham, neither accepted nor rejected their testimony. Instead, it concluded that "whatever Hirayama saw on the evening of the 16th, if anything, was not a matter of any great consequence...." But the question in this case is not whether there was "consequential" discoloration; the question is whether there was *any* discoloration. That question remains unanswered.

The effects of incomplete fact findings are compounded in this case by another misapplication of the burden of proof. Although the district court purported to accept our ruling with respect to the limited burden assumed by Parcel as the shipper's assignee it appears to have clung, at least in part, to the notion that Parcel, rather than Anglomar, had a duty to prove the cause of the discoloration. Undoubtedly this misconception was due in part to Parcel's vol-

---

3. Indeed, preservation of this separation of functions between district and appellate courts has recently led the Advisory Committee on Federal Civil Rules of the U.S. Judicial Conference to recommend that Rule 52(a) be amended to provide that the district court's findings of fact, "whether based on oral or documentary evidence" shall not be set aside unless clearly erroneous. Preliminary Draft of Proposed Amendments to the Federal Rules of Civil Procedure (August 1983).

untary efforts to show *how* the discoloration occurred rather than content itself with proving simply that the styrene was contaminated upon discharge. Judge Goettel, for instance, wrote:

"It is also possible that whatever caused the slight discoloration noted by Hirayama on the afternoon of the 16th was of a sort that could cause progressive discoloration over a matter of days. But that too is speculation. When all is said and done, we acknowledge that there is no proof to establish how the contamination occurred." (No. 77 Civ. 716 (S.D.N.Y. Feb. 28, 1983) at 18–19).

More importantly (and revealingly), the court indicated a continued reluctance to shift the burden to Anglomar, stating:

"Even if one believed that Hirayama saw slight discoloration and that this was sufficient to satisfy Parcel's burden of establishing a prima facie case, the Court cannot help but note that, under the circumstances of this case, it seems unfair to place the burden of establishing fault on Anglomar." (*Id.* at 24–25).

██ The reluctance of the district court after two trials to make credibility determinations, coupled with serious doubts as to its application of the principles laid down in our earlier opinion, has led us to review the entire documentary record with a view to determining whether the decision should be upheld. Our review satisfies us that the decision must be reversed; on the undiscredited evidence Parcel made out a prima facie case as a matter of law and Anglomar failed to offer any evidence that it had been free from fault or that the discoloration had occurred elsewhere than on the Stolt Lion.

The unrebutted evidence to which we refer is the following:

(1) The delivery of the styrene monomer in good condition to the Stolt Lion in Texas City for shipment to Yokohama;

(2) The discovery by Surveyor Hirayama that there was a slight discoloration of part of the styrene immediately after it was discharged into tanks on the Kyokuho Maru, which had been found to be clean when inspected by him on the same day before discharge and which had been used exclusively for the carriage of styrene;

(3) The marked discoloration of the discharged cargo three days later.

In response to this proof Anglomar offered no evidence of its own freedom from fault. On the contrary, Parcel's prima facie case was strengthened by

(1) Testimony by the Stolt Lion's Chief Officer (Sutherland) that the leaking suet blank on that ship could have sucked in black bilge that would discolor the styrene being pumped into the Kyokuho Maru;

(2) The opinion of the Stolt Lion's Master (Graham) that he "would be very much surprised if the suet blank weren't covered with liquid at some time during the operation" and that in such event the bilge "would be drawn in through that suet blank";

(3) The opinion of an expert (Steier) that the discoloration was caused by the suction of bilge through the leaking suet blank into the styrene.

The foregoing evidence, none of which was found to be incredible by the district court, compels us to conclude that it erred as a matter of law in deciding that Parcel had failed to make out a prima facie case. The district court's discomfort with the circumstantial nature of the evidence offered by Parcel is surprising; direct evidence would naturally be hard to find if, as appears to have been the case, contamination occurred in the pipeline just before discharge into the Kyokuho Maru.[4] The evidence here is fairly strong. As the district court recognized, "if a discoloration is discovered very shortly after the discharge, the tendency to assume (in the absence of proof that the receiving vessel was contaminated) that the discoloration occurred during the discharge is much stronger." The situation here is comparable to that in *Soco-*

4. The Stolt Lion crew had not placed a sampling cock in its manifold, which might have enabled Hirayama to obtain samples of the styrene being discharged.

ny *Mobil Oil Co. v. Texas Coastal and Intl., Inc., supra,* where the court noted that since the cargo of oil was there "discharged into a covered tank [found not to have contained any preexisting water,] the amount of time which passes prior to inspection does not increase the likelihood that the cargo will be damaged due to water contamination." 559 F.2d at 1011. The same principle applies where the tanks of the coastal steamer receiving the styrene are found to have been clean immediately before the discharge from the Stolt Lion.

The district court suggested that the rule permitting a shipper to make out a prima facie case and thus shift the burden to the carrier by showing delivery of the cargo to the carrier in good condition and discharge in a contaminated state may place an unfair burden on the carrier under the circumstances of this case. Parcel admittedly had notice of the discoloration within four days after the discharge whereas, if one does not accept Hirayama's testimony that he gave oral notice on the spot to the Stolt Lion's Chief Officer, Anglomar did not receive notice for many months. But nothing in COGSA, as it has been construed since 1936, exempts the carrier under such circumstances from the prima facie rule, which is the product of decades of maritime teaching. *See Vana Trading Co., Inc. v. S.S. "Mette Skou,"* 556 F.2d 100, 104 (2d Cir.), *cert. denied,* 434 U.S. 892, 98 S.Ct. 267, 54 L.Ed.2d 177 (1977); *Madow Co. v. S.S. Liberty Exporter,* 569 F.2d 1183, 1185 (2d Cir. 1978).[5] As the Supreme Court noted in *Commercial Molasses Corp. v. New York Tank Barge Corp.,* 314 U.S. 104, 111, 62 S.Ct. 156, 161, 86 L.Ed. 89 (1941):

"Since the bailee in general is in a better position than the bailor to know the cause of the loss and to show that it was one not involving the bailee's liability, the law lays on him the duty to come forward with the information available to him."

Indeed, the prima facie rule predated COGSA, *see The Frey,* 106 F. 319, 320–21 (2d Cir.1901); *The Rosalia,* 264 F. 285, 288 (2d Cir.1920), and at an even earlier time the carrier of goods by sea was "absolutely responsible for their safe arrival, unless loss or damage was caused by the Act of God or of the public enemy, or the inherent vice of the goods or the fault of the shipper—*and* (even where the loss was caused by one of these) the carrier was not negligent or otherwise at fault." *Nichimen Co. v. M.V. Farland,* 462 F.2d 319, 326 (2d Cir.1972) (quoting from Gilmore & Black, The Law of Admiralty § 3–22, at 119 (1957)).

We accordingly reverse the judgment of the district court dismissing the action and remand the case with directions to enter judgment in favor of Parcel. We decline Parcel's invitation to rule now on the damages to which it may be entitled. Issues remain as to the sufficiency of Parcel's proof of damages and the legal standard to be applied, which must be determined by the district court; they are therefore not ripe for appellate review, which hopefully may prove to be unnecessary.

The judgment of the district court is reversed and the case remanded to the district court for further proceedings in accordance with the foregoing.

**5.** As we noted in our earlier decision in this case at 617 F.2d 912 n. 4, Anglomar's reliance upon COGSA § 1303(6) is misplaced. Section 1303(6) provides that if the shipper fails to give prompt notice in writing of cargo loss or damage at the port of discharge within three days removal of the goods shall be prima facie evidence of delivery in the described condition. But the cases recognize that "[once] the plaintiffs come forward with sufficient evidence to suggest that the cargo was contaminated before discharge a fact issue is created, which the Court must resolve." *Socony Mobil Oil Co. v. Texas Coastal and Intl., Inc., supra,* 559 F.2d at 1012. Here Parcel came forward with such evidence.