**In re Lawrence E. WELBORN, Debtor.**

**Catheryn PURNELL, Plaintiff,**

v.

**Lawrence E. WELBORN, Defendant.**

**Bankruptcy No. 88–01907.**
**Adv. No. 88–0793.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 26, 1991.

Robert L. Montague, III, Alexandria, Va., for Catheryn Purnell.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

This matter comes before this Court upon the complaint of Catheryn Purnell ("plaintiff") for a determination as to whether her former husband's obligation in their divorce decree to hold the plaintiff harmless for a $110,769.28 [1] tax penalty is nondischargeable under 11 U.S.C. § 523(a)(5)(B) on the basis that it is in the nature of alimony, maintenance or support. For the reasons stated herein, we find that the debt is dischargeable.

Catheryn Purnell and Lawrence Welborn ("debtor") were married in October 1975. No children were born of the marriage. While married, the couple operated an engineering consulting business called Energy & Mineral Consultants, Inc. ("EMC"). The debtor was the chief executive officer of the business and the plaintiff served as EMC's secretary and treasurer. During 1983 and 1984 EMC failed to pay withholding taxes to the Internal Revenue Service ("IRS"). The IRS, in turn, personally assessed a 100% penalty against both the plaintiff and defendant for tax liability totalling $110,769.28. The couple subsequently obtained a divorce on December 3, 1987. The divorce decree provides that the debtor would assume full responsibility for the unpaid taxes and would hold the plaintiff harmless from any claim for the taxes. The divorce decree further provides that the debtor would reimburse the plaintiff if she were forced to make a payment for these taxes.[2] On October 4, 1988, Law-

Richard A. Bartl, Alexandria, Va., for Lawrence E. Welborn.

**1.** *See* Debtor's Schedule A–1 (listing debt to Internal Revenue Service as $110,769.28).

**2.** The December 3, 1987 Decree of Divorce A Vinculo Matrimonii provides in relevant part: And it further appearing to the Court that the Complainant, Cross–Defendant [Welborn] has agreed to assume full and complete responsibility for any unpaid taxes, be they income or otherwise, and any interest or penalties relating thereto incurred by the parties during their marriage and pertaining to the business known as Energy and Mineral Consultants, Inc., through the time of its dissolution, and to hold the

Defendant, Cross–Complainant [Purnell] harmless from any claim therefor and reimburse her if she should at any time be forced to make a payment to the Internal Revenue Service or other taxing authority on account thereof, it is ADJUDGED, ORDERED AND DECREED that the Complainant, Cross–Defendant shall assume full and complete responsibility for unpaid taxes and interest or penalties relating thereto incurred by the parties during their marriage and pertaining to the business known as Energy and Mineral Consultants, Inc., through the time of its dissolution, and shall hold the Defendant,

rence Welborn filed a petition under Chapter 7 of the United States Bankruptcy Code. The plaintiff subsequently filed a complaint to declare the debtor's obligation under the divorce decree nondischargeable.

■ This Court previously has set forth the standard applicable to determine whether an obligation is dischargeable under section 523(a)(5)(B) as being in the nature of alimony, maintenance or support. *See e.g. In re Mohn,* 118 B.R. 51 (Bankr.E.D.Va.1990); *In re West,* 95 B.R. 395 (Bankr.E.D.Va.1989).[3] As we observed in those cases, section 523(a)(5)(B) provides that a debtor is not discharged from any debt

> (5) to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—

> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support[.]

As the legislative history to this section indicates, "[w]hat constitutes alimony, maintenance, or support, will be determined under the bankruptcy laws, not State law." H.R.Rep. No. 595, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 6320. The burden of proving that an obligation is "actually in the nature of alimony, maintenance or support" is on the plaintiff spouse. *Tilley v. Jessee,* 789 F.2d 1074, 1077 (4th Cir.1986).[4]

■ The Fourth Circuit has made clear that "[t]he proper test of whether the payments are alimony lies in proof of whether it was the intention of the parties that the payments be for support rather than as a property settlement." *Melichar v. Ost,* 661 F.2d 300, 303 (4th Cir.1981) (citing *Shacter v. Shacter,* 467 F.Supp. 64 (D.Md.1979), *aff'd without published opinion,* 610 F.2d 813 (4th Cir.1979); *Nichols v. Hensler,* 528 F.2d 304 (7th Cir.1976); 3 Collier on Bankruptcy ¶ 523.15, at 523–111 (1981 ed.)), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1974, 72 L.Ed.2d 442 (1982). Intent is the threshold issue that must be crossed before other concerns become relevant. *Tilley,* 789 F.2d at 1078 n. 4. The Fourth Circuit has stressed that intent must be mutual as opposed to one spouse's unilateral efforts to obtain additional support. *Id.* (indicating that mutual intent to create support obligation must be shown).

■ In the context of a voluntarily executed marital settlement agreement, the intent of the parties to that agreement is determinative of whether the obligation is

---

Cross–Complianant [sic] harmless from any claim therefor and reimburse her if she should at any time be forced to make a payment on account thereof.

**3.** In her trial memorandum, the plaintiff urges this Court to adopt the standards set forth by the Sixth Circuit in *In re Calhoun,* 715 F.2d 1103 (6th Cir.1983). Because this Court is bound by decisions of the Fourth Circuit, we do not address whether the guidelines set forth in *Calhoun* have been satisfied in this case.

**4.** The United States Supreme Court recently has clarified that the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the preponderance-of-the-evidence standard. *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991) (holding that "the standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard.")

"The term 'preponderance' means that 'upon all the evidence ... the facts asserted by the plaintiff are more probably true than false.'" *Nissho–Iwai Co., Ltd. v. M/T Stolt Lion,* 719 F.2d 34, 38 (2d Cir.1983) [citations omitted]; *see Burch v. Reading Co.,* 240 F.2d 574, 579 (3d Cir.1957) (explaining that the intended effect of the "preponderance of the evidence" rule is to place the burden on the plaintiff to convince the jury that upon all of the evidence, the facts asserted by the plaintiff are more probably true than false.), *cert. denied,* 353 U.S. 965, 77 S.Ct. 1049, 1 L.Ed.2d 914 (1957); *see also Wood v. So. Ry.,* 104 Va. 650, 655, 52 S.E. 371, 372 (1905) (describing the preponderance standard and explaining that for a plaintiff to make out a *prima facie* case in an action to recover damages for personal injuries, the plaintiff must make it appear to be more probable that the injury was the proximate result of the defendant's negligence than from any other cause.).

in the nature of alimony, maintenance or support. *In re Long*, 794 F.2d 928, 931 (4th Cir.1986) (citing *Melichar*, 661 F.2d at 302). If, however, the parties have "submitted the issues of alimony and property division" to a judge or jury, it is the intent of the trier of fact, rather than the parties' intent, that is dispositive. *Long*, 794 F.2d at 931; *West*, 95 B.R. at 399.

■ Applying these standards to the case at bar, we must determine whether the plaintiff has proven that it is more probable than not that both she and the debtor intended the obligation at issue to be in the nature of alimony, maintenance or support.[5] We begin this inquiry by first summarizing the relevant testimony adduced at trial.

The plaintiff was the first witness to testify. She explained that in the course of obtaining her divorce, she sought a $9,000 lump sum settlement, attorney's fees and expenses.[6] According to the plaintiff, there was never any division of property, so that she received only what she took into the marriage. Although she testified that she sought indemnification for the tax liability of EMC, she specifically stated that she did not seek alimony, maintenance or support from the debtor. Tr. at 11–12. She explained that if she were not required to pay the tax obligation, she would be able to support herself on her salary. Only if she were forced to pay the tax obligation, did she feel that she would have to look to the debtor for financial support.[7] The plaintiff indicated that when she left the marriage, she was basically responsible for herself. She relocated to Denver and did not ask the debtor for moving expenses or

5. Although the obligation at issue is embodied in a divorce decree, it appears from the record that the issue of alimony was not submitted to the judge, who appears simply to have entered the uncontested divorce decree. We, therefore, must scrutinize the intent of the parties, rather than the intent of the court, which did not rule on the alimony issue. *See Long*, 794 F.2d at 931 (citing *Melichar*, 661 F.2d at 302 and explaining that in the context of a voluntarily executed marital settlement agreement, the intent of the parties to that agreement is determinative of whether the obligation is in the nature of alimony, maintenance or support).

Even if this Court were to examine the intent of the state court with respect to the divorce decree, the plaintiff has not proffered any evidence indicating that the state court intended for the debtor's assumption of the IRS debt to be in the nature of alimony, maintenance or support. The plaintiff herself admits that she did not ask for a *pendente lite* hearing or a final hearing on the alimony issue. Transcript of Trial, July 12, 1989, at 32 [hereinafter "Tr. at ___"]. Moreover, we reject the plaintiff's suggestion that the state court demonstrated its intent to treat the debtor's obligation as a support obligation by issuing a capias for the debtor's arrest and entering an order directing his compliance. The fact that the state court allowed the plaintiff to enforce rights afforded to her under the divorce decree, in no way suggests that the court intended for this to be a support obligation. The court in *In re Snyder*, 7 B.R. 147, 149 (W.D.Va.1980) recognized precisely this point. The *Snyder* court observed that although state law is not binding on a district court in a section 523(a)(5)(B) determination, Virginia Code § 20–109.1 allows the state court to incorporate by reference in a divorce decree an agreement between the parties. *Id.; see* Va.Code Ann. § 20–109.1 (1990) (providing in part that "[a]ny court may affirm, ratify and incorporate by reference in its decree dissolving a marriage or decree of divorce ... any valid agreement between the parties ... establishing or imposing any ... condition or consideration, monetary or nonmonetary...."). The *Snyder* court explained that the purpose of Virginia Code § 20–109.1 is to encourage the voluntary settlement of property, custody and support matters. The court observed that "[t]o facilitate the enforcement of the agreement the court may use its contempt power on any of the contract provisions." *Snyder*, 7 B.R. at 149 (citing *Morris v. Morris*, 216 Va. 457, 219 S.E.2d 864 (1975). Thus, as the *Snyder* court recognized, "[a]n agreement does not become 'alimony' simply because the court may use the power of contempt to enforce it." *Snyder*, 7 B.R. at 149.

6. The expenses included an accountant's fees for reducing the amount of taxes owed to the IRS.

7. In this regard, the plaintiff testified:

Q. Did you seek alimony, maintenance, or support?
A. No, I did not.
Q. Did you think if you were not required to pay the tax obligation you could support yourself?
A. Yes, I know that I can support myself on my salary.
Q. So it was only if you were forced to pay the tax obligation that you feel you would need to look to Mr. Welborn for financial support?
A. Yes, correct. I have no desire—I don't want anything from Mr. Welborn. I just would like him to be responsible for this debt that he said he would be responsible for.
Tr. at 11–12.

any other money. As she explained, "I was basically responsible for myself, period, with the knowledge when I got a job, I can support myself with the money I earned." Tr. at 14.

The plaintiff then testified that her intention in seeking the hold harmless clause in the divorce decree was that it would be in lieu of anything else that she would receive from the marriage. Tr. at 16. Prior to her divorce, she discussed her divorce agreement with Kenneth Butler, an attorney whose advice the plaintiff sought to reduce the tax liability to the IRS. The plaintiff indicated that she told Butler the following:

> I know that I discussed with him that this is what he [the debtor] agreed to do in lieu of other things that I thought were basically mine as part of a divorce settlement. This was what I accepted in lieu of money or any other possession, and that I—I mean, I thought it was taken care of. I thought there was an obligation that had been agreed to.

Tr. at 23. In response to her counsel's question as to why she felt this way, the plaintiff testified:

> Because Larry agreed to pay it. He agreed to do it as part of the divorce as his responsibility, as his way of, well, taking the responsibility from me and in lieu of anything else. That was all I had from the divorce. There was nothing else. That was what I wanted....

*Id.* The plaintiff explained that when she entered into the divorce agreement she was not in any position to have assumed responsibility for the IRS claim. To support this statement, she explained that her present salary is $17,000 and that her present monthly expenses exceed her income by about $500 per month.[8] The plaintiff claimed that she was in the same financial condition now as when she sought the divorce. In an attempt to demonstrate the disparate incomes between herself and the debtor, she noted that when she entered into the divorce decree, the debtor was a captain in the Navy earning between $40,000 to $50,000 per year. Tr. at 29.[9] Finally, she testified that she was very ill around the time of the divorce and that her illness made a considerable difference in her earning capability.

---

**8.** At this point, counsel for the debtor objected to testimony on the plaintiff's present needs. The Court previously had admonished plaintiff's counsel that the plaintiff's present financial condition is not relevant. Accordingly, the Court denied any testimony on the plaintiff's present earnings.

In attempting to show that the plaintiff still needed support, plaintiff's counsel presumably was relying on the guidelines set forth by the Sixth Circuit in *In re Calhoun*, 715 F.2d 1103 (6th Cir.1983). The *Calhoun* Court explained that to determine whether an obligation is in the nature of alimony, maintenance or support "the initial inquiry must be to ascertain whether the state court or the parties to the divorce *intended* to create an obligation to provide support through the assumption of the joint debts. If they did not, the inquiry ends there." *Id.* at 1109 (emphasis in original). The Court went on to explain that if the bankruptcy court finds that the threshold element of intent has been satisfied, then the court must inquire whether, *inter alia,* the assumption of the debt has the *effect* of providing the support *necessary* to ensure that the daily needs of the former spouse and any children of the marriage are satisfied. *Id.* The Court noted that the distribution or existence of other property may make the continuing as-

sumption of joint debts unnecessary for support. *Id.*

We note that the Sixth Circuit and the Fourth Circuit agree that intent is the threshold element that must be satisfied before other considerations become relevant. *Compare Calhoun,* 715 F.2d at 1109 *with Tilley,* 789 F.2d at 1078 n. 4. As explained below, we find that the plaintiff in the case at bar has not carried her burden of proving that both parties intended for the debt at issue to be in the nature of alimony, maintenance or support. Accordingly, our inquiry ends there. We note, however, that even if the plaintiff had met her threshold burden of proving mutual intent, this Court follows the majority rule of not taking into consideration the plaintiff spouse's present needs in a section 523(a)(5) determination. *See Forsdick v. Turgeon,* 812 F.2d 801, 803–04 (2d Cir.1987) (noting that Sixth Circuit's decision in *Calhoun* is example of minority view on question of whether bankruptcy court should consider the changed financial circumstances of wife in determining whether an obligation is dischargeable under § 523(a)(5) and finding that there is no warrant for bankruptcy court to evaluate an alimony award against the needs of the former spouse to whom it was granted).

**9.** The plaintiff indicated that she is an executive secretary. Tr. at 14.

On cross examination, the plaintiff admitted that she did not seek, through a *pendente lite* hearing, temporary support and maintenance from the debtor. She further acknowledged that when the final divorce decree was entered, she did not seek permanent alimony or support from the debtor. The debtor's counsel then drew the plaintiff's attention to Plaintiff's Exhibit # 3, which is a letter from the debtor to the plaintiff's counsel, Robert Montague, stating that the debtor agreed to accept the responsibility for the IRS debt in exchange for ownership rights in EMC.[10] When asked whether she turned the ownership rights over to the debtor, the plaintiff explained that she "never had an opportunity to" do so. Tr. at 33. In response to her counsel's inquiry on redirect as to whether she had any ownership rights in EMC to turn over, the plaintiff responded that she had no property of any kind, and any property that belonged to the company, the debtor had. She had nothing tangible in her possession and there were no stock certificates.

Upon the close of the plaintiff's testimony, the next witness called was Kenneth Butler, the attorney whose advice the plaintiff sought on reducing her tax obligation. In explaining his involvement with the divorce settlement, Butler stated:

I was in fact very much involved with respect to the determination of that settlement. When Mrs. Purnell first contacted me, she was aware of the heavy obligations of her husband, the biggest of which was the tax obligation. From the very beginning she indicated to me that it was important to her that he assume that obligation, that if he would do so, she would not expect to take anything else from him. That is in fact what happened. I counseled with her at the time the offer was made with respect to the lump sum payment, the payment of attorneys' and accountants' fees, and the assumption of the debt to the IRS.

The very most important thing of those discussions was, of course, the assumption of the IRS debt. I've counseled with her about an offer in compromise. I'm aware of her financial situation. I'm aware that it is very important that in order for her to support herself, she needs relief from the IRS debt. That has been the intent of the plaintiff throughout the proceeding as I have counseled her.

Tr. at 36–37. When asked whether he had documentary evidence of the plaintiff's intent, Butler testified with respect to a copy of a letter that Robert Montague, plaintiff's divorce counsel, had written to the IRS in March 1988. Butler testified that the letter stated that the debtor's assumption of the IRS debt was in lieu of alimony and support.[11] Butler explained that the letter was consistent with Butler's understanding that the plaintiff needed relief from the IRS debt to support herself.

Responding to whether he had any other knowledge or information concerning the intent of the parties, Butler explained that he had prepared a letter for the plaintiff to sign suggesting an offer of a $9,000 lump sum payment and relief from both the accountants' fees and the IRS debt. Butler stated that the letter was evidence of what the plaintiff intended at the time. According to Butler, the plaintiff was very aware of the debtor's financial obligations and that both Butler and the plaintiff felt that it was not realistic to ask the debtor for anything other than relief from the IRS debt.

The last witness to testify was the debtor, called as an adverse witness. The plaintiff's counsel first attempted to have the debtor acknowledge that the debtor did not ask the plaintiff for a waiver of rights to support or alimony. The debtor responded that the debtor never believed that the waiver of rights was an issue. Tr. at 45. According to the debtor "[i]t was never

---

**10.** The letter from Lawrence Welborn to Robert Montague, dated May 13, 1987, states in relevant part that "[i]n exchange for a signed commitment from your client to transfer all of her ownership rights in Energy & Minerals Consul-

tants, Inc. to me, I will accept responsibility for the above specified claim from the IRS for the amount of $88,509.33." Plaintiff's Exhibit # 3.

**11.** This letter was not introduced into evidence.

discussed, never mentioned [sic] in any way brought forward." Tr. at 46.

The plaintiff's counsel next asked the debtor to explain the nature of the plaintiff's interest in EMC. In response to this question the debtor stated that he had thought about taking some of the computer software that was developed when EMC was in existence and perhaps marketing that software. Subsequent events, however, indicated that there was no market for the software, which is now obsolete.

In responding to whether the plaintiff had engaged in any conduct that would prevent her from receiving alimony, the debtor, over the objection of the debtor's counsel, stated:

A. Has she engaged in any conduct which would prevent her from receiving alimony? Mr. Montague, this may not be the answer you want to hear. My ex-wife voluntarily left the marriage. There had been a lot of stress, lots of duress, as she well knows. Fidelity was not a continuing part of that marriage on her part. There was very definitely a consideration in my mind as to why alimony would have been totally absurd. Mr. Montague: You did not ask her to waive the right to seek it?
A. She did not have the gall to ask for it. I think I know why.
Q. Had you engaged in any conduct which would have entitled her to seek alimony?
A. Absolutely not.
Mr. Bartl: Objection.
Court: Your objection is noted. Overruled.
Witness: Absolutely not.

Tr. at 50–51.

On cross examination, the debtor explained that Montague prepared the divorce decree. The debtor indicated that he did not have any discussions with Montague about the terms of the agreement after receiving it. Further, the debtor did not discuss with Montague the issues of alimony or support for the plaintiff. The debtor did acknowledge that he sent a letter to Montague dated May 13, 1987 (Plaintiff's Exhibit # 3) reflecting the debtor's

intention with regard to any outstanding property rights. With respect to the debtor's intent at the time he signed the divorce decree the debtor testified:

A. Basically, there had been a long, drawn-out issue. I had never denied responsibility for the IRS debt, and knew that when and if I was able to, I would have to deal with it. My feeling in signing this document was that Mr. Montague knew what he was doing and that this would free Cathy of harassment by the IRS. I didn't feel it was—have any reason to believe it was an [sic] sham document. I thought it probably represented some sort of sound legal advice.
Q. Was it your intention at the time you signed this document and undertook that obligation to provide this as a means of alimony or support to your wife?
A. No.

Tr. at 54–55. Finally, the debtor noted that he filed bankruptcy because of actions taken by the IRS. No action by his wife affected his decision to file bankruptcy.

After careful examination of the testimony adduced at trial, we find that the plaintiff has failed to meet her burden of proving mutual intent. Specifically, the plaintiff has produced no evidence to prove that the debtor intended for the hold harmless clause to be in the nature of alimony, maintenance or support. Because the divorce decree is silent with respect to the parties' intent regarding the hold harmless provision, we examine first the testimony proffered by the plaintiff.

The plaintiff's testimony sheds little light on the debtor's intent with respect to this obligation. Although the plaintiff told Kenneth Butler that "this is what he [the debtor] agreed to do in lieu of other things that I thought were basically mine as part of a divorce settlement[,]" this statement does not make it appear more probable than not that the debtor intended for his assumption of the IRS debt to be alimony rather than a property settlement. Nor does it suggest that the debtor in any way was concerned about the plaintiff's ability to support herself upon the divorce. The

plaintiff's testimony throughout suggests that she felt that the debtor was morally obligated to assume the debt because he was responsible for incurring it. The fact that the debtor may have been responsible for incurring the debt and thus agreed to hold his former wife harmless for it, however, does not necessarily imply that he intended for the obligation to be in the nature of alimony or support.

Second, the testimony of Kenneth Butler sheds no light on the debtor's intent with respect to the obligation at issue. Although his testimony does address the plaintiff's intent to have the debtor assume the IRS obligation, Butler's testimony suggests virtually nothing with respect to the debtor's intent. Moreover, Butler's testimony regarding Montague's March 1988 letter to the IRS stating that the debtor's assumption of the IRS debt was in lieu of alimony, has little probative value in reflecting the debtor's intent when the divorce decree was executed. First, the March 1988 letter was drafted by plaintiff's counsel and more likely would reflect the plaintiff's intent. Second, it was written *after* the parties executed the divorce decree in December 1987. It, therefore, does not necessarily reflect either the debtor's or the plaintiff's intent *at the time of the divorce.*

The most damaging testimony came from the debtor himself, who was called as an adverse witness. First, when the plaintiff's counsel asked the debtor to admit that the debtor never asked the plaintiff for a waiver of rights to alimony, the debtor responded that the issue was never discussed or brought forward. Although the absence of a waiver of alimony provision does not necessarily imply that the debtor did, in fact, agree to alimony, here the debtor stated that the issue of waiving alimony was never discussed. Thus, the absence of a waiver of alimony provision in the divorce decree does not have any particular relevance. Furthermore, it was the plaintiff's counsel who asked the debtor, over the objection of the debtor's counsel, whether the plaintiff had engaged in any conduct that would prevent her from receiving alimony. The debtor indicated that

"alimony would have been totally absurd" because of his former wife's lack of fidelity during their marriage. We find that the plaintiff's probing into this area, over the objection of debtor's counsel, made clear that the debtor did not intend to give the plaintiff alimony. Furthermore, we found the debtor to be a very credible witness.

After examining the evidence proffered by the plaintiff, we can find no evidence that the debtor intended the hold harmless provision to be in the nature of alimony, maintenance or support. The evidence, in fact, establishes the opposite. Most significantly, the debtor's letter dated May 13, 1987, Plaintiff's Exhibit # 3, which was written to Montague before the divorce decree was executed, unequivocally demonstrates the debtor's intent with respect to the debt in question. In that letter the debtor specifically stated that in exchange for a signed commitment from the plaintiff to transfer all of her ownership rights in EMC to the debtor, the debtor would accept responsibility for the IRS claim. *See supra* note 10 (pertinent provisions of letter dated May 13, 1987). Moreover, we find nothing in that letter indicating that the debtor intended to provide the plaintiff with alimony, maintenance or support. This letter has significant probative value in reflecting the debtor's intent with respect to the obligation because it was written by the debtor before he signed the divorce decree. Furthermore, we find that the plaintiff's counsel did not successfully rebut any of the testimony adduced by the debtor's counsel with respect to this critical piece of evidence. The plaintiff's counsel's attempt to show that the plaintiff did not have any interest in EMC to give to the debtor, in no way diminishes the fact that the debtor intended to get something in return for assuming the IRS obligation. In short, the only credible evidence before this Court reflecting the debtor's intent *before* the divorce decree was executed is Plaintiff's Exhibit # 3. The plaintiff has put forth no evidence showing that the debtor's intent with respect to the obligation at issue changed between the time of the May 13, 1987 letter and the time of the divorce. Accordingly, we find that the plaintiff has

failed to meet her threshold burden of proving mutual intent.[12] Upon a careful examination of all the evidence presented by the plaintiff, we cannot find that the fact asserted by her—that the debt at issue was intended to be alimony—is more probably true than false.

Accordingly, we find that the debtor's obligation embodied in the December 3, 1987 divorce decree to hold the plaintiff harmless for the IRS tax penalty is a dischargeable obligation that is not in the nature of alimony, maintenance or support pursuant to 11 U.S.C. § 523(a)(5)(B).

An appropriate order will be entered in accordance with this opinion.

**12.** In her trial memorandum, the plaintiff relies on several cases to support her complaint. One of these cases, *In re Vogt*, 14 B.R. 743 (Bankr.E.D.Va.1981), *rev'd without published opinion*, 691 F.2d 498 (4th Cir.1982), was reversed by the Fourth Circuit and therefore would not support the plaintiff's case.

Another case, *In re Sledge*, 47 B.R. 349 (E.D.Va. 1981), is factually distinguishable from the case at bar. The issue in *Sledge* was:

> Where, prior to declaring bankruptcy, a debtor has agreed to pay to third party creditors debts incurred by him and his ex-wife, and *the payment of such debts is stipulated in a separation agreement confirmed and adopted as part of a final decree of divorce by a State Court, and the payment of such debts is designated by the parties in the language of the agreement to be in the nature of support,* are such debts dischargeable in bankruptcy under 11 U.S.C. § 523(a)(5)(B)?

*Id.* at 351 (emphasis supplied). In affirming the bankruptcy court's ruling that such debts were nondischargeable as being in the nature of ali-mony, the district court relied on the fact that the parties' stipulation labeled the obligations as being in the nature of support. *Id.* at 353–54. The divorce decree in the case at bar does not label the hold harmless provision as alimony. Accordingly, we find no merit in plaintiff's suggestion that the divorce decree in the case here is analogous to the stipulation in *Sledge.*

The plaintiff also relies on *In re Williams*, 703 F.2d 1055 (8th Cir.1983), in which the Eighth Circuit affirmed the bankruptcy and district court's ruling that the parties' agreement, *inter alia,* that the debtor would pay certain joint debts owed to banks, finance companies, and department stores, was a nondischargeable support obligation. The Court explained that "[d]ebts payable to third persons can be viewed as maintenance or support obligations; the crucial issue is the function the award was intended to serve." *Id.* at 1057. Unlike the situation in *Williams,* the plaintiff here has not proven that the debtor's assumption of the IRS debt was intended by both parties to serve a support function.