In re William S. EDWARDS, d/b/a Edwards Excavating, Debtor.

Patricia A. TAVELLA, f/k/a Patricia T. Edwards, Plaintiff,

v.

William S. EDWARDS, Defendant.

Bankruptcy No. 91–50503.
Adv. No. 91–5172.

United States Bankruptcy Court, D. Connecticut.

Sept. 26, 1994.

---

Jamie K. Gerard, Nevas, Nevas & Capasse, Westport, CT, for plaintiff.

Andrew F. Fink, Carron, Grace, Weinstein & Fink, Westport, CT, for debtor/defendant.

## MEMORANDUM AND ORDER ON COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT UNDER 11 U.S.C. SECTION 523(A)(5)

ALAN H.W. SHIFF, Bankruptcy Judge.

The plaintiff seeks a determination that a certain hold harmless obligation created by a dissolution decree is nondischargeable under § 523(a)(5). For the reasons that follow, I find that the debt is nondischargeable.

### SCOPE OF INQUIRY

Parties and state courts are increasingly aware of the effect of a subsequent bankruptcy discharge on a state court domestic relations award. Accordingly, an attempt may be made to draft unambiguous language so that the obligation created by the state court decree will not be thwarted by the bankruptcy discharge. Those efforts commonly employ language expressing an intent that the obligation is actually in the nature of alimony, maintenance, or support so that it will be excepted from discharge under § 523(a)(5).

It is well settled that the bankruptcy court has "no jurisdiction over divorce or alimony allowances." *Pauley v. Spong (In re Spong),* 661 F.2d 6, 9 (2d Cir.1981). This court was never intended to render or modify judgments awarding alimony or dividing marital assets, or to serve as an appellate court to review the propriety of such judgments. Thus, as discussed in more detail *infra* at pp. 512–13, my task is not to determine whether the plaintiff needed alimony at the time of the dissolution, but rather to determine whether the state court intended to create a debt that was actually in the nature of alimony, i.e. necessary for the plaintiff's support. If that intention is clear from the state court's decree, I need go no further in the determination of whether that debt is nondischargeable. If it is not, I must look beyond the four corners of the decree to the evidence before that court to determine whether it made such an award.

### BACKGROUND

The marriage of the plaintiff and defendant was dissolved after a contested trial by the decree of the Superior Court for the Stamford/Norwalk Judicial District of the State of Connecticut on November 8, 1990. *See* Plaintiff's Exhibit 1 (the "Decree"). The relevant portions of the Decree include the following:

> The evidence indicates that the marriage has irretrievably broken down, and judgment may enter dissolving the marriage on that ground.

> The plaintiff is 28 years old, and the defendant is 29 years old. Both enjoy good health. Both are gainfully employed at the present time. The evidence revealed that the cause of the breakdown of this marital relationship was the behavior of the defendant towards the plaintiff. The defendant has acted in an immature and irresponsible manner during this short marriage.

The court has carefully considered the criteria set forth in Connecticut General Statutes sections 46b–62, 46b–81 and 46b–82 in reaching the decisions reflected in the orders that follow.

> The following orders may enter.

> 1. The defendant shall pay to the plaintiff as periodic alimony the sum of one hundred ($100) dollars per week. The payments shall commence on Monday, November 19, 1990 and each Monday thereafter until the death of either party, the plaintiff's remarriage or for a period of three years, whichever event first occurs....

> 2. The court finds that the defendant owes an arrearage of $3,050 on the *pendente lite* alimony order. The defendant's motion to modify that order is denied. The defendant has failed to sustain his

burden of proof that there has been a substantial change of circumstances since the original order was entered....

3. The defendant shall transfer his interest in the marital residence located at 16 Lufberry Avenue, Norwalk, Connecticut, to the plaintiff. The plaintiff shall indemnify and hold harmless the defendant from any liability on the outstanding mortgage.

4. The defendant is awarded his 1983 Chevrolet truck; his 1986 Mack truck; his snowplow and frame; his roller and flat bed.... [paragraph 5 provides for further awards of property to the defendant, and paragraph 6 provides for awards of property to the plaintiff]

7. The defendant shall be responsible for the liabilities scheduled on his financial affidavit dated November 7, 1990. He also shall be responsible for the payment of the G. Fox debt of $250 and the American Express debt of $1,400 that are listed on the plaintiff's financial affidavit. The defendant shall indemnify and hold harmless the plaintiff from any liability for these obligations. This order is made for the purpose of freeing the plaintiff of her liability as to these past obligations so that she may properly care for herself. This indemnification is necessary for the plaintiff's continued economic welfare and accordingly, the defendant's obligation in this respect is in the nature of alimony and support.

8. The plaintiff shall be responsible for the payment of the liabilities listed on her financial affidavit dated November 6, 1990, with the exception of the G. Fox and American Express debts. She shall indemnify and hold harmless the defendant from any liability for these obligations.

9. Each party shall hold the other harmless and indemnify the other as to any income taxes and related interest and penalties as to that party's income through 1990.

10. Each party shall be responsible for her and his own attorney's fees....

The defendant commenced this chapter 7 case on March 1, 1991. On July 11, 1991, the plaintiff commenced the instant adversary proceeding, seeking a determination that the defendant's obligation (the "Obligation") to hold the plaintiff harmless from certain liabilities, as provided in paragraph 7 of the Decree, was not dischargeable because it was actually in the nature of alimony, maintenance, or support within the meaning of § 523(a)(5)(B). It is undisputed that the debts included within the Obligation are (i) a debt in the original principal amount of $20,000 to the Norwalk Municipal Employees' Credit Union on which the plaintiff and defendant are jointly liable, *see* Plaintiff's Exhibit 3 (the "Credit Union Debt"); (ii) a debt in the original principal amount of $39,300.92 to Ford Motor Credit for the purchase of a backhoe used by the defendant in his business, which debt the plaintiff guaranteed, *see* Plaintiff's Exhibit 4 (the "Backhoe Debt"); (iii) a $1,400 debt to American Express, incurred for the parties' honeymoon travel (the "American Express Debt"); and (iv) a $400 debt to G. Fox, incurred to purchase a suit owned by the defendant (the "G. Fox Debt").

On June 15, 1992, the plaintiff moved for summary judgment. I determined that the issue, i.e. whether the Obligation was actually in the nature of alimony, maintenance, or support, was the same factual issue which had been actually litigated before and decided by the state court, and that the resolution of that issue was essential to the state court judgment. *See Tavella v. Edwards (In re Edwards),* 151 B.R. 19, 22 (Bankr.D.Conn. 1993) ("Edwards I"). I found that the language contained in paragraph 7 of the Decree was more than a mere label designating the award as "alimony," but was a finding of fact that the award was in the nature of support for the plaintiff. Accordingly, I concluded that under the doctrine of collateral estoppel, the defendant was precluded from relitigating that issue in this court. *Id.*

On appeal, the district court noted that even though it was "arguable that the Connecticut court may have intended to foreclose the possibility that the hold-harmless provisions would be discharged in bankruptcy", Connecticut law "clearly obligated that court to apply a standard that differs from that applicable under the Code...." 162 B.R. 83, 86 ("Edwards II"). The district court con-

cluded that the state court did not apply the federal law standard in making its factual determinations and that collateral estoppel did not apply.

On remand, I denied the plaintiff's renewed motion for summary judgment on December 8, 1993, and this adversary proceeding went to trial on May 17, 1994.

## DISCUSSION

### I. FEDERAL LAW

Under § 523(a)(5), a discharge does not discharge an individual from any debt

> to a spouse, former spouse, or child of the debtor, for alimony to, maintenance for, or support of such spouse or child, in connection with a separation agreement, divorce decree or other order of a court of record, determination made in accordance with State or territorial law by a governmental unit, or property settlement agreement, but not to the extent that—
>
> (B) such debt includes a liability designated as alimony, maintenance, or support, unless such liability is actually in the nature of alimony, maintenance, or support....

 I note at the outset it is well settled that a debtor's obligation to hold harmless his or her former spouse from enumerated debts may be a nondischargeable obligation under § 523(a)(5).

> This provision will ... make nondischargeable any debts resulting from an agreement by the debtor to hold the debtor's spouse harmless on joint debts, to the extent that the agreement is in payment of alimony, maintenance, or support of the spouse, as determined under bankruptcy law considerations that are similar to considerations of whether a particular agreement to pay money to a spouse is actually alimony or a property settlement.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, pp. 5787, 5963, 6320; *Linet v. Azia (In re Azia),* 159 B.R. 71, 74 (Bankr. D.Mass.1993). A hold harmless provision may be nondischargeable support even though the debts covered by the provision

were not themselves incurred for necessities of life. *Armento v. Armento (In re Armento),* 127 B.R. 486, 490 (Bankr.S.D.Fla.1991). A determination of whether the Obligation is actually in the nature of alimony, maintenance, or support is an issue of fact, *Brody v. Brody (In re Brody),* 3 F.3d 35, 38 (2d Cir.1993); *Sampson v. Sampson (In re Sampson),* 997 F.2d 717, 721 (10th Cir.1993), which the plaintiff must prove by a fair preponderance of the evidence, *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); *Jones v. Jones (In re Jones),* 9 F.3d 878, 880 (10th Cir.1993).

In *In re Spong, supra,* 661 F.2d 6, the Second Circuit held that a debt for legal services rendered to the debtor's former spouse in connection with a divorce proceeding fell within the § 523(a)(5) exception. Noting legislative history to the effect that the issue under § 523(a)(5) would be determined under bankruptcy, rather than state, law, the court nevertheless relied on the fact that attorneys' fees were generally considered alimony, maintenance, and support under state law. "Congress could not have intended that federal courts were to formulate the bankruptcy law of alimony and support in a vacuum, precluded from all reference to the reasoning of the well-established law of the States." 661 F.2d at 9. The court also noted the "well-established principle of bankruptcy law that dischargeability must be determined by the substance of the liability rather than its form." *Id.*

In *Forsdick v. Turgeon,* 812 F.2d 801 (2d Cir.1987), the court reviewed a bankruptcy court determination that a $100,000 award, which a state court trial referee termed "nonmodifiable alimony", was nondischargeable.

> While the code ... reflects a strong public policy of providing debtors with fresh starts, congress has also determined that certain competing public policy interests shall take precedence.... By virtue of § 523(a)(5), congress has chosen between two competing interests—those of bankrupts and those of their former spouses and offspring—and it chose in favor of the latter.

*Id.* at 802; *accord Grogan v. Garner, supra,* 498 U.S. at 287, 111 S.Ct. at 659–60 ("The

statutory provisions regarding nondischarge-ability reflect a congressional decision to exclude from the general policy of discharge certain categories of debts—such as child support [and] alimony.... Congress evidently concluded that the creditors' interest in recovering full payment of debts in these categories outweighed the debtors' interest in a complete fresh start."). Citing to *Spong's* conclusion that reference to state law was appropriate in making the § 523(a)(5) determination, the court held that "while the characterization of the award by the referee is not determinative of the question, it is *strongly indicative* that the $100,-000 was intended as, and constituted, alimony." *Id.* at 803 (emphasis added). The court examined the underlying factual findings of the referee and found them "consistent with his characterization of the award as alimony." *Id.* The court analyzed Connecticut law in an attempt to ascertain the true nature of the award made by the state court referee. Reasoning that bankruptcy courts should not interfere with a state court determination of whether a spouse is entitled to support, the court of appeals, rejecting *Long v. Calhoun (In re Calhoun),* 715 F.2d 1103 (6th Cir. 1983), held that the bankruptcy court could not consider the changed circumstances of the parties in making the § 523(a)(5) determination.[1]

An inquiry of the sort urged by the husband would put federal courts in the position of modifying the matrimonial decrees of state courts, thus interfering with the delicate state systems for dealing with the dissolution of marriages and the difficult and complex results that flow therefrom. State-crafted family law mechanisms should not be disturbed by federal court intervention unless there is an unmistakable mandate from congress to do so in order to achieve a valid federal objective.

We find no such mandate here. To the contrary, congress has clearly required the bankruptcy court to protect the rights of a former spouse receiving alimony at the expense of a debtor seeking a fresh start. The husband's argument would turn this legislative intent on its head by having the bankruptcy court entertain arguments about, and decide issues of dischargeability on the basis of, a continuing need for support instead of protecting the award previously found by the state courts to be appropriate.

812 F.2d at 803–04 (citation omitted).

In *In re Brody, supra,* 3 F.3d 35, the court affirmed a bankruptcy court determination that an obligation was intended as support, not property settlement, even though the obligation was contained in a section of the separation agreement labelled "distributive award."

Under bankruptcy law, the intent of the parties at the time a separation agreement is executed determines whether a payment pursuant to the agreement is alimony, support or maintenance within the meaning of section 523(a)(5). Courts have looked at a variety of factors in seeking to ascertain this mutual intent. However, such a list is not necessarily exclusive. All evidence, direct or circumstantial, which tends to illuminate the parties' subjective intent is relevant.

*Id.* at 38 (citations omitted). The court found that while the characterization of the award in the agreement was persuasive, it was not dispositive, and that the substance of the obligation controlled over the form. The court also found that the "parol evidence rule does not apply in cases such as the instant one, and factual inquiry under section 523(a)(5) is not limited to the four corners of a separation agreement or divorce decree." *Id.* at 39. The court then held that the courts below were not bound by the state court judgment, and that the status of a payment under state law, although relevant to the § 523(a)(5) determination, was not dis-

---

1. The Sixth Circuit has recently clarified *Calhoun* by stating that that decision was not intended to require the bankruptcy court to permit the discharge of a support obligation to the extent the support was no longer necessary at the time of the bankruptcy filing. *Fitzgerald v. Fitzgerald (In re Fitzgerald),* 9 F.3d 517, 520–21 (6th Cir. 1993). The court found that where an obligation was referred to as alimony and was intended to permit the obligee to maintain her standard of living, it was nondischargeable irrespective of the obligee's present needs, and irrespective of whether the obligee was employed and self-supporting at the time of the divorce.

positive. *Id.* The court rejected the argument that the obligee was judicially estopped from challenging the status of the obligation: "[A]n obligation's status as alimony, maintenance or support ... is a question of federal bankruptcy law separate and distinct from state law, and any label given the obligation, whether by the parties or the state court, is not dispositive." *Id.*[2]

██ It should be emphasized, however, that the *Brody* court held that the intent of the parties *determines* the issue under § 523(a)(5) when there is a separation agreement, not that intent is merely the first step of the inquiry or only one factor to be considered. And, *Brody* suggests by implication that the intent of the state court determines the nature of the obligation when the award was ordered after trial. *See Grasmann v. Grasmann (In re Grasmann),* 156 B.R. 903, 909 (Bankr.E.D.N.Y.1992) ("Where an obligation created by a judicial decision is claimed to constitute a nondischargeable debt for alimony, support and maintenance, it is the intention of the court issuing the decree that is controlling and the court's intention has to be gathered from its language."); *Purnell v. Welborn (In re Welborn),* 126 B.R. 948, 951 (Bankr.E.D.Va.1991); *cf. Senkel v. Fahland (In re Fahland),* 110 B.R. 431, 433 (Bankr.E.D.Mo.1990) (in determining that undesignated award was nondischargeable, the court relied on an affidavit from the state court judge stating that the judge intended the award for support rather than property settlement). *Brody* "employs only a single condition: proper intent, in the sense of design, function, or purpose." *In re Michaels,* 157 B.R. 190, 194 (Bankr.D.Mass.1993) (discussing *In re Gianakas,* 917 F.2d 759 (3d Cir.1990), upon which *Brody* relied). Thus, by focusing the inquiry on intent, *Brody* eliminates bankruptcy court consideration of whether the parties or the court were objec-

tively correct when they determined that support was or was not required. The *Brody* approach preserves the distinction between the *nature* of the debt, which is properly before the bankruptcy court, and the *validity and amount* of the debt, which is within the domain of the state court. That approach is consistent with *Forsdick, supra.* For the same reasons that bankruptcy courts cannot redetermine support needs as of the time of the petition filing, they cannot redetermine support needs as of the time of the dissolution. The first issue may be raised only by a request for modification addressed to the state court; the second, only by an appeal. *See also Comer v. Comer (In re Comer),* 723 F.2d 737, 749 (9th Cir.1984) (evidence offered to attack the amount and validity of an alimony and child support judgment was related to "the *extent* of [the debtor's] obligation ... not the *nature* of that debt, and was thus irrelevant to the bankruptcy court's determination of dischargeability"; res judicata precluded any attack on amount or validity of debt).

██ While *Brody* states that the parol evidence rule was inapplicable under the facts of that case, I do not read that to mean that a state court decree could never unambiguously demonstrate the intent of the court or the parties. *Brody* does not suggest that the language of the decree should not be given significant, and *in an appropriate case, even controlling, weight.* It is particularly appropriate to afford such weight to the language of the decree where it is clear that the court or the parties had the bankruptcy law standard in mind. To conclude otherwise would necessarily require the relitigation in bankruptcy court of an issue unequivocally decided by the state court. *See infra,* pp. 521–525.

---

2. *Brody's* statement that the state court judgment at issue did not bind the bankruptcy court and its refusal to apply judicial estoppel do not indicate that collateral estoppel could not apply under appropriate circumstances in a § 523(a)(5) proceeding. Neither the Second Circuit nor the courts below compared the issues before the state court to the § 523(a)(5) issue to determine if they were identical. *See In re Brody,* 154 B.R. 408, 414 (E.D.N.Y.1993) ("The considerations governing the two decisions are *not necessarily the same.*") (emphasis added). Further, the facts indicate that the award in question was included in an article of the separation agreement labelled "distributive award." That label alone was insufficient to demonstrate to the bankruptcy court that the state court applied the federal law standard. *See In re Brody,* 120 B.R. 696, 698 n. 2, 699 (Bankr.E.D.N.Y.1990).

It is noted that *Brody* differs from the Tenth Circuit's *In re Sampson, supra,* 997 F.2d 717, 723, in that under *Sampson,* a further inquiry is necessary in bankruptcy court to determine whether a state court awarded support obligation was necessary even if it were determined that the state court's intention was unambiguous. The difficulty with the *Sampson* approach arises when the bankruptcy court finds that the parties or the court intended to create a support obligation, and then proceeds to disregard that intent by determining that the debt is in whole or part dischargeable because the obligee did not in fact need the award for his or her support at the time it was made. Where the debt is created by judicial decree, that approach could place the bankruptcy court in the role of an appellate court with the extraordinary power to decide *de novo* an issue of fact determined in the state trial court. Where the debt is created by a separation agreement, that approach tells litigants that they cannot, even in an arms-length transaction, stipulate to a state of facts which will be given effect in a subsequent judicial proceeding.[3] Indeed, the *Sampson* approach could result in federal courts modifying final dissolution decrees on the basis of the stale recollections of disgruntled parties who have already had a full and fair opportunity to present their arguments to a judicial officer.

■ Both the text of § 523(a)(5) and Second Circuit precedent direct bankruptcy courts to be critical and circumspect in reviewing the language of a state court decree. Where the language of a decree leaves *any* room for doubt as to the intent of the court or the parties, courts have examined other factors to illuminate intent. *In re Grasmann, supra,* 156 B.R. at 908; *see Blaustein v. Berg (In re Berg),* 167 B.R. 9, 13 (Bankr. E.D.N.Y.1994) ("Where the intention of the parties is in dispute and is not clear, the multi-factor test is utilized in an attempt to draw the most accurate conclusion possible of what the parties intended.") (citation omitted); *accord Chism v. Chism (In re Chism),* 169 B.R. 163, 169 (Bankr.W.D.Tenn.1994);

*Johnson v. Johnson (In re Johnson),* 156 B.R. 338, 340 (Bankr.M.D.Fla.1993). Even when the decree is ambiguous, it is still entitled to considerable respect as the seminal document in the creation of the subject debt. *Brown v. Brown (In re Brown),* 74 B.R. 968, 972 (Bankr.D.Conn.1987).

■ Apart from the language of the decree, relevant factors include the context in which the debt appears in the decree; whether the obligation terminates on the death or remarriage of either party; whether there are children who must be supported; whether the obligation balances the incomes of the parties; the relative earning power of the parties; whether the payments are to be made directly to the spouse or to a third party; whether there is a lump sum payment or installment payments; whether an assumption of debt has the effect of providing necessary support to insure that the daily needs of the former spouse are met; whether an assumption of debt has the effect of providing support necessary to insure a home for the spouse; whether there was a division of property and a division of debts related to that property; and the age and health of the former spouse. *Id.* at 971; *In re Berg, supra,* 167 B.R. at 13; *Tsanos v. Bell (In re Bell),* 47 B.R. 284, 287 (Bankr.E.D.N.Y.1985); *see In re Brody, supra,* 3 F.3d at 38.

## II. CONNECTICUT LAW

Under Conn.Gen.Stat.Ann. § 46b–40 (West Supp.1994), a decree of dissolution shall be granted when the court finds that one of ten causes has occurred. The first cause is that the "marriage has broken down irretrievably", which was the cause found by the state court. *See* Decree, p. 1.

Connecticut follows the dichotomy common under family law, pursuant to which the court may equitably divide the property of the litigants, and/or determine whether one of them must pay alimony to the other. Conn.Gen.Stat.Ann. § 46b–81(c) (West 1986) sets forth the following factors with respect to *property division:*

---

**3.** Where the separation agreement is embodied in a judicial decree entered after independent review by a state court judge, both concerns are

implicated. For a response to the argument that parties cannot waive their right to discharge before bankruptcy, *see infra,* at p. 524.

the court ... shall consider the length of the marriage, the causes for the ... dissolution ..., the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate, liabilities and needs of each of the parties and the opportunity of each for future acquisition of capital assets and income. The court shall also consider the contribution of each of the parties in the acquisition, preservation or appreciation in value of their respective estates.

Conn.Gen.Stat.Ann. § 46b–82 (West 1986) provides that the court may order alimony "in addition to or in lieu of an award pursuant to section 46b–81." In making the determination of whether *alimony* is appropriate,

the court ... shall consider the length of the marriage, the causes for the ... dissolution ..., the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties and the award, if any, which the court may make pursuant to section 46b–81....

The Connecticut Supreme Court has consistently held that a property division award and an alimony award can be distinguished by the purpose which they serve. In construing § 46b–82, the court has held:

The purpose of alimony is to meet one's continuing duty to support; *Wood v. Wood,* 165 Conn. 777, 784, 345 A.2d 5 (1974);

while the purpose of property division is to unscramble the ownership of property, giving to each spouse what is equitably his. *Weiman v. Weiman,* 188 Conn. 232, 234, 449 A.2d 151 (1982); *accord Borkowski v. Borkowski,* 228 Conn. 729, 735, 638 A.2d 1060 (1994); *Rubin v. Rubin,* 204 Conn. 224, 228, 527 A.2d 1184 (1987); *Dubicki v. Dubicki,* 186 Conn. 709, 714 n. 2, 443 A.2d 1268 (1982).[4] Further, the Connecticut Supreme Court held, in a case which assumed the applicability of the standards of what is now § 46b–82, "The primary basis for an award of alimony has been not to punish a guilty spouse but to continue the duty to support the other who, in legal contemplation, was abandoned." *Tobey v. Tobey,* 165 Conn. 742, 748 & n. 2, 345 A.2d 21 (1974); *see Robinson v. Robinson,* 187 Conn. 70, 72, 444 A.2d 234 (1982) ("While alimony, in whatever form ... is not to be considered either as a reward for virtue or as a punishment for wrongdoing, a spouse whose conduct has contributed substantially to the breakdown of the marriage should not expect to receive financial kudos for his or her misconduct.").[5]

While the state court is obligated by § 46b–82 to *consider* each of the enumerated factors in making an alimony award, it does not follow that it must attribute an amount for each factor. "While the trial court must consider the delineated statutory criteria, no single criterion is preferred over the others, and the court is accorded wide

---

**4.** In Edwards I, I relied in part on *Wood v. Wood, supra,* 165 Conn. 777, 345 A.2d 5, for the conclusion that alimony under Connecticut law is based on the continuing duty of support, and that that standard is the same employed by bankruptcy courts in determining nondischargeability under § 523(a)(5). *See* 151 B.R. at 22. Even though *Wood* was decided under an earlier version of the alimony statute, the Connecticut Supreme Court has followed *Wood* in construing § 46b–82, which was enacted in 1973. Indeed, the *Wood* court noted the enactment of what is now § 46b–82 and stated that its decision would have been the same under the new statute. 165 Conn. at 784 n. 2, 345 A.2d 5. *See also Tobey v. Tobey,* 165 Conn. 742, 748 n. 2, 345 A.2d 21 (1974) ("The factors for awards of alimony established under ... the new act parallel those of former case law and include the length of the marriage, the causes for the divorce, and the age, health, station, occupation, amount and sources of income, vocational skills, employability, estate and needs of each of the parties.").

**5.** Indeed, there is authority that suggests that the factor of the causes of the breakdown included in § 46b–82 derives from the common law rule that a former wife was entitled to continuing support only if she did not violate the marriage contract, for example, by abandoning her former husband. *See Pasquariello v. Pasquariello,* 168 Conn. 579, 582–83, 362 A.2d 835 (1975) (alimony derived from power of court to require payments of money over time to a former wife where she was the "innocent party" and estate was such that property could not be assigned); *Bielan v. Bielan,* 135 Conn. 163, 167, 62 A.2d 664 (1948) ("The plaintiff had chosen to leave her husband without justifiable cause and for the time had forfeited her right to support."). Where the spouse claiming alimony was the abandoning party, the legal presumption that that spouse was the *abandoned* party would be inapposite.

latitude in varying the weight placed upon each item under the peculiar circumstances of each case." *Carpenter v. Carpenter*, 188 Conn. 736, 740–41, 453 A.2d 1151 (1982); *accord Bartlett v. Bartlett*, 220 Conn. 372, 378, 599 A.2d 14 (1991). Further, the court need not make express findings as to each of the factors. *Weiman v. Weiman, supra*, 188 Conn. at 234, 449 A.2d 151. "[T]he relative fault of the parties is only one factor to be considered and cannot be given precedence over any other enumerated factor." *Sands v. Sands*, 188 Conn. 98, 102, 448 A.2d 822 (1982), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 792, 74 L.Ed.2d 997 (1983). Further, Connecticut courts have held that because alimony is primarily based on a continuing duty to support, it is modifiable in the event there is a substantial change of circumstances indicating that the needs of the obligee or the ability of the obligor to pay have changed. Conn.Gen.Stat.Ann. § 46b–86(a) (West Supp. 1994); *Borkowski v. Borkowski, supra*, 228 Conn. at 735, 638 A.2d 1060. A property award is not modifiable. It is noted that in this case the state court modified the plaintiff's alimony. *See infra*, p. 517.

Of the factors listed in § 46b–82 for making an award of alimony, most of them go directly toward the amount of money which the recipient of the award will need to meet his or her needs. The one that arguably does not is the cause for the dissolution, and even that factor can be interpreted as essentially support-based. Where one spouse violates the marriage contract, the innocent spouse may be entitled to support to redress the resulting psychological, emotional, and financial effects.

The defendant argues that the state court award was not intended for the plaintiff's support but rather to punish him for his abusive behavior in causing the marital breakdown. Apart from the plain language of the state court's decision to the contrary, the defendant's argument is unpersuasive because the state court did not award alimony to punish his conduct, but even if it had, an award for the plaintiff's support might in whole or part be based on the defendant's wrongful conduct. Were I to accept the defendant's argument, an abusive spouse or-

dered to pay alimony would be favored as a debtor in bankruptcy court over a nonabusive spouse ordered to pay alimony, in that the former would obtain a discharge of the awarded alimony by claiming that the award was not intended for support but rather as punishment, while the latter could not make such a claim. And arguably, the more abusive the behavior, the more likely that result. Section 523(a)(5) reflects a policy determination that property divisions should be discharged, not that fault-based alimony awards should be discharged. An award made to punish abusive conduct should be included within the scope of nondischargeable alimony less a villain benefit from his or her villainous behavior. But because I conclude that the Obligation was not based even in part on the cause of the dissolution or any consideration other than the economic need of the plaintiff, I need not, and do not, reach that conclusion.

### III. EVIDENCE

Since Edwards II concluded that the language of the Decree did not conclusively demonstrate whether the state court intended that the Obligation was solely for the support of the plaintiff, it is necessary for me to consider evidence extrinsic to the Decree to determine the state court's intent.

The trial testimony disclosed the following:

1. *Plaintiff's Income, Expenses, and Assets*. At the time of the divorce, the plaintiff was employed as an administrative assistant with a weekly wage of about $450. Her expenses exceeded her income by $500 to $525 per week. The plaintiff's financial affidavit, filed with the state court, Plaintiff's Exhibit 2, stated total weekly expenses of $973.50 and a net weekly wage of $453.59, so that her expenses exceeded her income by $519.91. Of the weekly expense, $52.33 was attributable to payments on the G. Fox and American Express Debts. The affidavit indicated that the home was valued at $160,000 but had no equity. The only other listed assets were an automobile valued at $4,500, a one-half interest in the excavating and plowing equipment valued at $9,500, and a $6 bank account. Total liabilities were listed as $39,310.

2. *Defendant's Income, Expenses, and Assets.*

In September of 1990, the defendant went to work as a driver for United Parcel Service ("UPS"), and he was so employed at the time of the dissolution. The defendant's income varied from week to week. His pay stub for the week ending September 29, 1990, reflected gross wages of $342.49, and net wages of $198.09, for about 30 hours of work; however, the stub also reflected a *temporary* deduction of $82.55 for union dues, without which his net income would have been $280.64. *See* Defendant's Exhibits A and B. The defendant's financial affidavit, Defendant's Exhibit D, showed a gross weekly wage of $432 and a net weekly wage of $238, including a temporary deduction of $83 for the union dues. The total weekly expenses were stated to be $706 of which $257 was attributable to the Backhoe Debt. The listed assets included the residence, in which the defendant stated he owned a one-half equity interest valued at $10,000 [6]; two vehicles valued at $5,500; equipment valued at $3,200 (a notation indicates that the backhoe was "repossessed"); $1,250 in cash held in a trust account; and $1,000 in stock.[7] The listed liabilities total $79,755, including $31,000 for the Backhoe Debt.

Although the defendant's financial affidavit reflected income only from his UPS employment, the plaintiff testified that she introduced at the dissolution trial evidence of supplemental income from a paving and excavating business and a snow plowing business totalling approximately $17,000 as of the time of that trial. However, the defendant's income tax return for 1990 showed adjusted gross income of only $5,813, all of which was listed on line 7 of the form 1040, for "wages, salary, tips, etc." *See* Defendant's Exhibit C. No business income was reported, nor was Schedule C, which would provide the details of such income, attached.

The plaintiff was the bookkeeper for the defendant's excavating business. She testified that he earned over $60,000 per year in that business for the first few years. The defendant testified that although he may have grossed $60,000 the first year, his net income may have been $20,000 to $25,000. Due to personal problems, he did not engage in the excavating business during April of 1990. He continued to work as an excavator in the summer of 1990, but split the profits with another individual, who provided the equipment and a laborer. He owned a dump truck and a roller, and retained them after the dissolution. He had purchased a trailer and compressor in the spring of 1990, and sold them two months later. He also testified that he "willingly gave ... up" the backhoe he had purchased from Ford Motor Credit and that he had "sold it for the balance which was owed on the loan." *Tr.* at 77–78. He stopped his excavation work about August of 1990. On cross examination, the defendant testified that he may have received $12,000 from excavating in 1990, which he had to divide with his partner.[8]

As to the defendant's snow plowing business, the plaintiff testified that the defendant made $1,000 per snow storm, and that the defendant had received between $6,000 and $9,000 from that business in March of 1990 and thereafter for snow plowing in January and February. The defendant admitted that he did not know the amount of his income from the snow plowing business in 1990 because the plaintiff "kept track of the books,"

---

**6.** Notwithstanding the defendant's allegation in his affidavit that the residence had $20,000 in equity, the defendant's counsel admitted at the dissolution trial that the residence had no equity. *See* Defendant's Exhibit E, at p. 215.

**7.** The words "snow plow & frame" are handwritten on the affidavit, but the dollar amount assigned as the value is not clearly legible, and was not included in the total assets of $20,950.

**8.** The following is an excerpt from page 91 of the transcript:

Q [plaintiff's counsel]: "And would you say that of that 12 thousand dollars, that at least five thousand dollars of that money was not yours—"
A [defendant]: "I don't think, not even that. Not even that."
Taken literally, the testimony is that not even $5,000 of the $12,000 was *not* the defendant's. i.e., at least $7,000 of it was his. If the defendant misunderstood the question, his answer may have been intended to indicate that "not even" $5,000 of the $12,000 was his. My decision would remain the same under either construction of that testimony.

*Tr.* at 66, but testified that he received no income from the business after March of 1990. The defendant retained his snow plow and truck and had the ability to do snow plowing after the divorce.

3. *The Plaintiff's Support Needs.* After the defendant stopped making payments on the Credit Union Debt, the plaintiff testified that she had to pay $100 per month on that debt, which forced her to stop going to school and to pay less on account of her other debts. It is noted that the plaintiff's financial affidavit disclosed her tuition and book expenses. The plaintiff testified that she could not afford to buy clothes, go out to lunch, or spend money on entertainment.

Because the defendant had "continually threatened [her] with bankruptcy," *Tr.* at 27, the plaintiff asked the state court to make a finding that the Obligation was necessary for her support. The plaintiff testified that if she were required to pay the Obligation, she would have been forced to use her periodic alimony payments of $100 for those debts rather than for her daily maintenance. In November 1993, while this adversary proceeding was pending, the plaintiff sought a modification of the alimony award. The state court found a $51,000 alimony arrearage, including all of the debts covered by the Obligation as well as past due periodic alimony payments.

The defendant testified that he did not support the plaintiff during the marriage.[9]

4. *Restraining Order.* After the dissolution action was filed but before it concluded, there was a criminal proceeding involving the defendant's contact with the plaintiff. A restraining order had entered against him in that proceeding, and the judge at the dissolution trial was aware of that order.

## IV. ANALYSIS: THE NATURE OF THE OBLIGATION

The following facts support the conclusion that the Obligation is actually in the nature of alimony, maintenance, or support and therefore nondischargeable under § 523(a)(5):

1. *Language of the Decree.* I do not construe Edwards II to prohibit a consideration of the language of the Decree as evidence, and indeed as the most persuasive evidence, of the state court's intent. The plain language employed by the state court in paragraph 7 of the Decree strongly indicates that the court intended the Obligation to be in the nature of support. "This order is made for the purpose of freeing the plaintiff of her liability as to these past obligations so that she may properly care for herself. This indemnification is necessary for the plaintiff's continued economic welfare and accordingly, the defendant's obligation in this respect is in the nature of alimony and support." Decree at ¶ 7, *see supra*, p. 509. The clear implication is that the award of alimony in paragraph 1 of the Decree would have been increased and extended to account for the debts included in the Obligation in the absence of the paragraph 7 indemnification.[10]

This case is similar to *Reiff v. Reiff (In re Reiff)*, 166 B.R. 694 (Bankr.W.D.Mo.1994), in which a separation agreement contained the following language with reference to an indemnification obligation: "Husband agrees that his payment hereof is in lieu of a support obligation to Wife and that his obligation to indemnify Wife hereunder shall not be dischargeable in U.S. Bankruptcy Court." *Id.* at 695. Even though none of those obligations were for necessities of life, the court found that the quoted language clearly stated the intention of the parties that the hold harmless obligation was in the nature of support and that the court was "obligated to enforce that intent." *Id.* at 696. *Accord Hughes v. Hughes (In re Hughes)*, 164 B.R. 923, 927 (E.D.Va.1994) (an agreement un-

---

9. The defendant also attempted to prove that the plaintiff's father had at one point guaranteed or cosigned another credit union debt of the defendant, but the plaintiff's father had been taken off of the loan and the defendant's mother substituted. That evidence may demonstrate a financial benefit to the plaintiff's father, but it in no way affects the plaintiff's need for support.

10. The fact that the $100 per week of alimony awarded in paragraph 1 of the Decree was time-limited does not indicate that the Obligation was not for support, but only that the state court concluded that the need for support would not be as great in three years' time.

518

equivocally showed that the purpose of an obligation was for support where it stated that the obligation was not dischargeable in bankruptcy as it was for the obligee's support).

The state court's intent is also evident from what it did not say. Given that the primary function of alimony in Connecticut is support, not punishment, it is likely that the court would have specified if it were making an award based on fault. *Cf. Martone v. Martone*, 28 Conn.App. 208, 213, 611 A.2d 896, 899 (court originally ordered the defendant to pay the plaintiff $15,000 "as damages for his conduct in brutally causing the break-up of this marriage," but later specified that the award was in fact an alimony award), *cert. denied in part and granted in part on other grounds*, 224 Conn. 909, 617 A.2d 166 (1992). In addition, hold harmless provisions in the Decree other than the Obligation, see paragraphs 3, 8 and 9, do not contain a finding that the obligations are in the nature of support. Particularly instructive is the fact that paragraph 9 obligated the defendant to hold the plaintiff harmless from income taxes, but did not state that the plaintiff required that hold harmless obligation for her support. In addition, it appears that the plaintiff's counsel requested that the state court order the defendant to pay the plaintiff's attorney's fees and declare that award to be in the nature of alimony and support so that it would not be dischargeable, Defendant's Exhibit E at p. 212, yet the state court ordered each party to bear their own attorney's fees. If the court's motive had been punishment, it is likely that the court would have declared every award in favor of the plaintiff to be alimony and support so that none of them would be dischargeable. It is therefore apparent, contrary to the defendant's assertions, that the court considered the financial burden which the debts included in the Obligation would impose upon the plaintiff and determined that the Obligation was in fact necessary for her support, even though other obligations were not.

Further, there is no suggestion in the Decree that the Obligation was based on any of the factors unique to property settlement under Connecticut law, i.e. the contribution of each of the parties in the acquisition, preservation, or appreciation in value of their respective estates, the parties' liabilities, and the opportunity of each for future acquisition of capital assets and income.

2. *Necessary Support.* The plaintiff's expenses exceeded her income by over $500 per week at the time of the dissolution. The evidence indicates that she could not afford to pay for the necessities of life at that time, including clothing and a payment of $1,000 per month on the mortgage on her residence, absent both the weekly alimony payments and the Obligation.[11] *See Drennan v. Drennan (In re Drennan)*, 161 B.R. 661, 666 (Bankr.E.D.Ark.1993) (debtor's agreement to hold former spouse harmless on joint credit card debts was nondischargeable where former spouse could not both pay those debts and support herself); *Mackey v. Kaufman (In re Kaufman)*, 115 B.R. 435, 442 (Bankr. E.D.N.Y.1990) (assumption of credit card debt was "intended to free [the obligee] of any third-party debt incurred during the marriage and was consistent with the intent to provide [the obligee] with the necessary support to meet her daily needs."). The plaintiff also testified that she could not continue her education, which would likely have enhanced her ability to support herself after expiration of the time-limited alimony award in paragraph 1 of the Decree. The defendant received more of the equity in the marital assets than the plaintiff, increasing the plaintiff's need for support. *See Catron v. Catron (In re Catron)*, 164 B.R. 912, 922 (E.D.Va.1994). The defendant's suggestion that the plaintiff could have filed for bankruptcy herself, an argument which was made to and obviously rejected by the state court, *see* Defendant's Exhibit E, p. 217, in no way bears on the issue of the nature of the Obligation. The plaintiff was liable for the debts she listed in her dissolution action, and it is apparent that the Decree reflected the state

11. While a few of the expense entries on the plaintiff's financial affidavit were for arguably nonessential items, such as those for gifts and cigarettes, there is no evidence that the defendant challenged those items in the state court proceeding. Further, the amount of those items is *de minimis,* and the plaintiff required the Obligation for her support even in their absence.

court's attempt to permit her to meet her obligations without forcing her to file bankruptcy. Even if I accept the defendant's contention that he did not support the plaintiff during the marriage, an alimony award is based on the plaintiff's needs and the defendant's ability to pay, not on the pre-dissolution level of support. *England v. England,* 138 Conn. 410, 414–15, 85 A.2d 483 (1951). A contrary rule would prohibit a court from awarding alimony when one spouse should have but did not provide adequate support for the other during the marriage. *Id.*

3. *Structure of the Decree.* I disagree with the defendant's argument that the Obligation appears in the section of the Decree dealing with property settlement. The Decree is not divided into labelled sections. Paragraphs 1 and 2 relate to support; paragraphs 3 through 6 appear to relate to property division; and paragraphs 7 through 10 relate to hold harmless obligations which could be either in the nature of support or in the nature of property settlement.

4. *Modification of the Award.* The evidence is undisputed that the plaintiff obtained a modification of her alimony award to $51,000 based on the defendant's failure to pay the Obligation. That modification is evidence that the court's original intent in making the award was to create a support obligation. As noted, only alimony, not a property division, may be modified under Connecticut law. Significantly, in determining whether a particular award is in the nature of alimony rather than in the nature of a property settlement, Connecticut courts employ an analysis similar to that employed by the bankruptcy courts, examining the language of the decree and its structure. *See Passamano v. Passamano,* 228 Conn. 85, 90–91, 634 A.2d 891 (1993).

Although under Connecticut law the Obligation as "alimony" could have been based in part on the defendant's fault and still be subject to modification, it is apparent here that it was not based at all on fault. Under Connecticut law, alimony may be modified only on the ground of a substantial change in circumstances of either party. *Borkowski v. Borkowski, supra,* 228 Conn. at 735–36, 638 A.2d 1060. The only post-dissolution change in circumstances in this case was the plaintiff's economic hardship caused by the defendant's failure to pay the Obligation as ordered by the Decree. Consequently, the state court determined that the *entire* amount of the debts covered by the Obligation was due to the plaintiff as additional alimony. Had the Obligation been based on fault, there would have been no substantial change in circumstances justifying an increase in the amount of the alimony to cover the entire unpaid Obligation.

5. *Balancing of Incomes.* The evidence is compelling that the defendant earned a substantial amount of pre-dissolution income in addition to what he earned from his UPS job. Although the defendant's 1990 income tax return showed income of only $5,813, all of which was wages, his wages from the approximately 14 weeks he worked for UPS that year would have been over $6,000 from that job alone, assuming a gross weekly wage of $432 as shown on his financial affidavit. The defendant admitted that he was doing excavating work with a partner until August of 1990, yet he reported no business income. I credit the plaintiff's testimony that the defendant had 1990 income from snow plowing and excavating work of about $17,000 that was not reported on his financial affidavit (or on his 1990 income tax return). I do not credit the defendant's testimony that he received no income from snow plowing after March of 1990.

Additional income of $17,000 received in 1990 prior to the dissolution would have increased the defendant's average net weekly wage, exclusive of temporary payments for union dues, to about $700 per week.[12] That weekly wage would have exceeded the plaintiff's by $247, and given the defendant in-

---

**12.** The defendant's financial affidavit reflects a net weekly wage, exclusive of any deduction for union dues, of $321. Undisclosed income of $17,000 spread over the approximately 44 weeks in 1990 prior to the November 8, 1990, dissolu-

tion, would result in additional net weekly income (it does not appear any taxes were withheld or paid from this sum) of about $386, for a total of $707.36 in net weekly income during 1990.

come exceeding expenses by $251 per week.[13] The plaintiff's alimony award of $100 per week, together with payments on the Credit Union Debt ($81), G. Fox Debt ($5.82), and American Express Debt ($46.51), would total $233.33, almost exactly the amount needed to balance the parties' incomes.[14] As to the Backhoe Debt (the fourth of the debts included in the Obligation), it is noted that the backhoe had been repossessed, so the hold harmless for the Backhoe Loan was apparently intended to cover the possibility that the creditor would pursue a deficiency against the plaintiff, which she could not afford to pay.

In determining earning capacity, the court could and apparently did consider the probability of the defendant's future income from his snow plow business and his earning capacity from the potential reestablishment of his excavating business. "In a proper case the amount of alimony awarded may be based upon earning capacity or prospective earnings rather than actual earned income." *Tobey v. Tobey, supra,* 165 Conn. at 749, 345 A.2d 21; *see also Broderick v. Broderick,* 20 Conn.App. 145, 147, 565 A.2d 3, 5 (1989) (ultimate inquiry in determining income reasonably available to supporting spouse is his or her earning capacity). Such an award "is particularly appropriate ... where there is evidence that the payor has voluntarily quit or avoided obtaining employment in his field." *Hart v. Hart,* 19 Conn.App. 91, 95, 561 A.2d 151, 152, *cert. denied,* 212 Conn. 813, 565 A.2d 535 (1989). Earning capacity "is an amount which a person can realistically be expected to earn considering such things as his vocational skills, employability, age and health." *Lucy v. Lucy,* 183 Conn. 230, 234, 439 A.2d 302, 304 (1981). The defendant was young, in good health, and skilled in excavating and snow plowing at the time of the dissolution. He retained some of his excavating equipment and his plowing equipment under the terms of the Decree, and apparently received the customer list

from the snow plowing business. *See* Defendant's Exhibit E, p. 214. He could have continued his snow plowing business part-time, just as he did while employed as an excavator.

6. *Periodic Payments/Termination.* The fact that the Obligation was not payable directly to the plaintiff is of no significance as it served the function of freeing her from weekly expenses that she could not afford. Moreover, while the Obligation was not expressly stated to end on remarriage or death, it was clearly designated as alimony under Connecticut law and thus would ordinarily terminate on the death of either party absent a specific provision to the contrary in the Decree. *Kimball v. Comm'r,* 853 F.2d 120, 123 (2d Cir.1988). If it did not terminate on death, it could be subject to modification on the basis of changed circumstances. Further, the Obligation was inherently time limited in that it would be satisfied once the defendant had paid the debts in full.

7. *Absence of Evidence of a Punitive Purpose.* The defendant attempts to convince me that the state court labelled the Obligation as support in order to punish him for causing the breakdown of the marriage by depriving him of a discharge. Apart from the earlier observation that a punitive purpose does not disqualify an award as alimony, *see supra,* p. 515, the defendant's effort is singularly unconvincing.

The defendant offers a partial transcript of the state court proceedings, *see* Defendant's Exhibit E. That transcript contains only summation by counsel, and contains neither evidence nor any finding of fact by the court to suggest that it intended to punish the defendant. The focus of the plaintiff's counsel's summation was that the defendant's hidden income justified an award of alimony notwithstanding that such an award might seem "out of line" based solely on the financial affidavits. Exhibit E, pp. 202–07. The plaintiff's attorney also argued that it was

---

13. That calculation excludes the monthly payment for the Backhoe Loan, which was not in repayment.

14. The partial trial transcript, Defendant's Exhibit E., p. 211, indicates that the plaintiff asked for weekly alimony of $225. It thus appears that

the reduction of that award to $100 may have been designed to account for the approximately $130 per week represented by the three debts covered by the Obligation that were still in repayment.

"equitable" to award her alimony because she had "carried [the] household almost singlehandedly for the last year." Exhibit E, p. 207. But the fact that the plaintiff's attorney made that argument, or other arguments based on the equities of the case, in no way indicates that the court intended the Obligation to be in the nature of a property settlement.

The record in the state court is devoid of any suggestion that the state court judge did not in fact intend the Obligation to be for the plaintiff's support. Although the state court made separate findings in the Decree that the "cause of the breakdown of this marital relationship was the behavior of the defendant towards the plaintiff" and that the defendant had "acted in an immature and irresponsible manner" during the marriage, those findings were made at the beginning of the Decree, which was dealing with the causes of the dissolution. The only statements by the state court with respect to the Obligation were that it was made so that the plaintiff "may properly care for herself," that it was "necessary for the plaintiff's continued economic welfare," and that it was "in the nature of alimony and support." Decree at ¶ 7. Under Conn.Gen.Stat.Ann. § 46b–40 (West Supp.1994), the state court was obligated to make a finding as to the cause of the dissolution. There is nothing to link the Obligation, set forth much later in the Decree, to the finding of the defendant's fault. The state court could have made an award based in part on fault, but retained broad discretion not to do so, and the record here indicates that it did not. *Cf. In re Chism,* *supra,* 169 B.R. at 170 (state court had "focused on the adulterous acts of [the debtor] during the marriage, his criminal conduct, and his actions resulting in dissipation of marital assets" and consciously labelled certain awards as alimony even though it intended them as property settlement).

It is inappropriate for a bankruptcy court to conclude that a state court would find that an award is alimony, maintenance, or support when it really is not, just to deprive a spouse/debtor of a subsequent discharge, in the absence of compelling support in the state court record. There is none here.

Such a conclusion violates basic principles of comity and respect for the state judiciary. Accordingly, I reject any suggestion by the defendant that it was improper for the state court to include language in its Decree so that its intent as to the nature of the Obligation would be clear to a bankruptcy court which might later have the duty to determine that intent. Having failed to convince the state court that the plaintiff did not need support, the defendant now attempts to make the same argument here. But this court has no appellate authority, and that attempt must fail.

## V. COLLATERAL ESTOPPEL UNDER § 523(A)(5)

As noted, the district court concluded in *Edwards II* that collateral estoppel was not appropriate in this case because the state court did not apply the federal law standard, and the issues were therefore not identical. Lest *Edwards II* be read as a blanket prohibition on the application of that doctrine to § 523(a)(5) determinations, a comment on its parameters is useful for illuminating the proper scope of bankruptcy court scrutiny in a § 523(a)(5) proceeding.

The district court did not hold or imply that collateral estoppel is not appropriate in § 523(a)(5) actions. As the district court recognized, the Supreme Court has held that "collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to § 523(a)." *Grogan v. Garner, supra,* 498 U.S. at 285 n. 11, 111 S.Ct. at 658 n. 11 (1991).

Pursuant to 28 U.S.C.A. § 1738 (West 1994), the properly authenticated records and judicial proceedings of any state court "shall have the same full faith and credit in every court within the United States and its Territories and Possessions as they have by law or usage in the courts of such State, Territory or Possession from which they are taken." That doctrine, which dates from 1790, "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Academy of Orthopaedic Surgeons,* 470 U.S. 373, 380, 105 S.Ct. 1327, 1332, 84 L.Ed.2d 274 (1985); *see also Burka v. New York City*

*Transit Auth.*, 32 F.3d 654, 657 (2d Cir.1994) ("[A] state court judgment has the same preclusive effect in federal court as the judgment would have had in state court."); *Long Island Lighting Co. v. Imo Indus., Inc.*, 6 F.3d 876, 885 (2d Cir.1993). Bankruptcy courts are subject to that mandate, and are bound by determinations made in a state court judgment unless the judgment was procured by fraud or the state court lacked jurisdiction.

> While the record strongly suggests that the merits of [the creditor's] claims are doubtful, [the debtor] should have attacked these claims in the state court. Bankruptcy proceedings may not be used to relitigate issues already resolved in a court of competent jurisdiction.

*Kelleran v. Andrijevic*, 825 F.2d 692, 695 (2d Cir.1987), *cert. denied*, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988).

▆ The doctrines of res judicata and collateral estoppel "not only reduce unnecessary litigation and foster reliance on adjudication, but also promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." *Allen v. McCurry*, 449 U.S. 90, 95–97, 101 S.Ct. 411, 415, 66 L.Ed.2d 308 (1980). In reversing a court of appeals decision refusing to afford collateral estoppel effect to a state court decision on an issue of unconstitutional search and seizure, the *Allen* Court held:

> The actual basis of the Court of Appeals' holding appears to be a generally framed principle that every person asserting a federal right is entitled to one unencumbered opportunity to litigate that right in a federal district court.... But the authority for this principle is difficult to discern. It cannot lie in the Constitution, which makes no such guarantee, but leaves the scope of the jurisdiction of the federal district courts to the wisdom of Congress.... [N]othing in the language or legislative history of [42 U.S.C.] § 1983 proves any congressional intent to deny binding effect to a state-court judgment or decision when the state court, acting within its proper jurisdiction, has given the parties a full and fair opportunity to litigate federal claims, and thereby has shown itself willing and able to protect federal rights.... There is, in short, no reason to believe that Congress intended to provide a person claiming a federal right an unrestricted opportunity to relitigate an issue already decided in state court simply because the issue arose in a state proceeding in which he would rather not have been engaged at all.

*Id.* at 103–04, 101 S.Ct. at 419–20 (footnotes omitted); *cf. Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 84, 104 S.Ct. 892, 897–98, 79 L.Ed.2d 56 (1984) (Section 1738 "embodies the view that it is more important to give full faith and credit to state-court judgments than to ensure separate forums for federal and state claims."). The same analysis applies in the context of § 523(a)(5). The right to a bankruptcy discharge is an important federal right, but that fact does not alone authorize bankruptcy courts to disregard state court judgments which have determined facts which establish an exception to that right.

▆ Under *Marrese*, unless federal law creates an exception to § 1738, a federal court must apply state collateral estoppel rules. Section 523(a)(5) does not create an exception to § 1738 for the purposes of collateral estoppel. "[A]n exception to § 1738 will not be recognized unless a later statute contains an express or implied partial repeal." *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 468, 102 S.Ct. 1883, 1890, 72 L.Ed.2d 262 (1982). Repeals by implication are not favored; "whenever possible, statutes should be read consistently." *Id.* A repeal by implication may be found, however, when two acts are in irreconcilable conflict, in which event the later statute controls to the extent of the conflict, or when the later act covers the whole subject of the earlier one and is clearly intended as a substitute. *Id.*

Section 523(a)(5)(B) directs the bankruptcy court not to rely solely on the fact that a particular award is "designated" as alimony, maintenance, or support. The legislative history demonstrates that Congress was concerned with the lack of uniformity that resulted where bankruptcy courts resorted to state laws for the definition of nondischargeable alimony. *See* H.R.Rep. No. 595, 95th

Cong., 1st Sess. 364 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News, pp. 5787, 5963, 6320. The application of collateral estoppel does no violence to the goal of uniformity, because it requires that the issue of fact in the subsequent action be identical not merely in form, but in substance, to that in the prior proceeding. *See Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992) ("Issues of fact may bear the same label without being identical."), *cert. denied,* —— U.S. ——, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993). Collateral estoppel insures that state law determinations are passed through the sieve of the federal law standard, and will survive intact only if they coincide precisely with that standard.

The rationale for applying collateral estoppel is buttressed by the fact that the state court has the jurisdiction and expertise to determine the federal law issue of whether an award is actually in the nature of alimony, maintenance, or support in connection with a proceeding to enforce the award brought after a bankruptcy discharge. *See* § 523(c); *Rose v. Rose*, 481 U.S. 619, 625, 107 S.Ct. 2029, 2033–34, 95 L.Ed.2d 599 (1987) ("We have consistently recognized that '[t]he whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States.' *In re Burrus*, 136 U.S. 586, 593–94, 10 S.Ct. 850, 852–53, 34 L.Ed. 500 (1890)."); *Nutter v. Reed (In re Reed)*, 161 B.R. 943, 944 (Bankr.N.D.Ohio 1993). Indeed, the bankruptcy court can abstain from deciding that issue so that it may be presented to the state court. *See* § 305(a); 28 U.S.C.A. § 1334(c) (West 1993). Thus it follows that the state court can determine the underlying factual issues prepetition so that its judgment will be given effect in any subsequent bankruptcy case. *See Rosenbaum v. Cummings (In re Rosenbaum)*, 150 B.R. 990, 992–93 (Bankr.E.D.Tenn.1992), *aff'd,* 150 B.R. 994 (E.D.Tenn.1993) (a debtor who failed to assert as an affirmative defense in a state court post-bankruptcy enforcement action that a debt had been discharged was barred from asserting that claim in his second bankruptcy case).

Section 523(a)(5) is not intended to override the valid judgments of state courts, but to require bankruptcy courts to scrutinize them carefully to ensure that only those awards which are actually in the nature of alimony, maintenance, and support are not discharged. To the extent the state court has determined that precise issue, the careful application of collateral estoppel respects both the jurisdiction and expertise of state courts and the important federal right of a bankruptcy discharge.

> Collateral estoppel applies in bankruptcy courts only if, *inter alia,* the first court has made specific, subordinate, factual findings on the identical dischargeability issue in question—that is, an issue which encompasses the same *prima facie* elements as the bankruptcy issue—and the facts supporting the court's findings are discernible from that court's record.

*Dennis v. Dennis*, 25 F.3d 274, 278 (5th Cir.1994). Further, collateral estoppel could avoid the anomalous result of the bankruptcy court being required to determine the facts that existed at the time of the dissolution, often years before the bankruptcy proceeding. *See Rabeiro v. Rabeiro (In re Rabeiro)*, 151 B.R. 965 (Bankr.M.D.Fla.1993); *Smith v. Smith (In re Smith)*, 114 B.R. 457, 465 (Bankr.D.Miss.1990) (collateral estoppel precludes the bankruptcy court "from inquiring into the 'reasonableness' of the support and alimony obligations of the debtor.").

Courts have raised a number of objections to applying collateral estoppel to § 523(a)(5) proceedings.

1. *Lack of jurisdiction.* Some courts suggest that the bankruptcy courts have exclusive jurisdiction to determine nondischargeability issues. While that is so for some of the § 523(a) subsections, it is not for § 523(a)(5). Even as to the proceedings within the exclusive jurisdiction of the bankruptcy courts, Supreme Court precedent indicates that while res judicata may not be applied, collateral estoppel may. *See Grogan v. Garner, supra*, 498 U.S. at 295 n. 11, 111 S.Ct. at 724–25 n. 11; *Brown v. Felsen*, 442 U.S. 127, 134–39, 99 S.Ct. 2205, 2211–13, 60 L.Ed.2d 767 (1979); *see also Rally Hill Prods., Inc. v. Bursack (In re Bursack)*, 163

B.R. 302, 307–08 (Bankr.M.D.Tenn.1994). The only relevant issue is whether the state court had jurisdiction to render the judgment which contains the factual finding at issue. Further, *Marrese* teaches that applicable state law determines the effect jurisdiction has on collateral estoppel.

2. *Absence of a bankruptcy filing.* Some courts suggest that a state court could never determine dischargeability prior to the commencement of a bankruptcy case. That of course follows, but that conclusion is not dispositive. Collateral estoppel could nevertheless apply to the factual issue that an award was in the nature of support.

■ 3. *Waiver of discharge.* Where the debt is created by agreement of the parties, whether court ordered or otherwise, some courts have suggested that the agreement amounts to a prohibited prepetition waiver of discharge. *See* §§ 524(a), 727(a)(10). I disagree. A debtor has no right to the discharge of a debt that falls within § 523(a)(5). If the parties define a debt in their agreement as necessary for support, it is by that definition not dischargeable and therefore the waiver doctrine is not applicable.

■ 4. *Federal law.* Some courts contend that because the nondischargeability issue is governed by federal law, collateral estoppel cannot apply to state court determinations on that subject. I disagree. If the state court applies the § 523(a)(5) standard and all of the requirements of collateral estoppel are met, it would be wasteful for the bankruptcy court to relitigate the same issue. In view of the dual jurisdiction over § 523(a)(5) matters, bankruptcy courts are not the exclusive guardians of a debtor's discharge. *See supra,* p. 523.[15]

5. *Labels attached by the parties or the state court do not control.* Section 523(a)(5)(B) directs the bankruptcy court not to rely on the way in which the award is designated. The terms "label" and "designation" suggest a surface appellation only. If

that surface appellation could mask a different substance, the bankruptcy court must inquire beyond the form to determine that substance. But language can be more than a label, i.e. reflective of actual intent.

As noted, the bankruptcy court is obligated to apply collateral estoppel to a Connecticut state court judgment if Connecticut law would require its courts to apply that doctrine.

"Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim." ... *In re Juvenile Appeal (83–DE),* 190 Conn. 310, 316, 460 A.2d 1277 (1983). " 'For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment.' " ... *Virgo v. Lyons,* 209 Conn. 497, 501, 551 A.2d 1243 (1988). An issue is "actually litigated" if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined.... An issue is necessarily determined if, "in the absence of a determination of the issue, the judgment could not have been validly rendered." F. James & G. Hazard, Civil Procedure (3d Ed.1985) § 11.19.

*Jackson v. R.G. Whipple, Inc.,* 225 Conn. 705, 714–15, 627 A.2d 374, 378 (1993) (footnote and some citations omitted); *see also State of Connecticut v. Ball,* 226 Conn. 265, 276, 627 A.2d 892, 898–99 (1993). Thus, I must apply the doctrine of collateral estoppel to a state court decree where the issue under § 523(a)(5): (i) is identical to that determined in the state court, (ii) was actually litigated there, and (iii) was necessary to the state court judgment.

As to the identity of the issues—assuming *arguendo* that the federal law standard could not include any part of an award based on

---

15. Further, the fact that the state court lacks the power prepetition to grant or deny a bankruptcy discharge precludes the operation of res judicata, but not of collateral estoppel, in a subsequent bankruptcy proceeding. *See Burgos v. Hopkins,* 14 F.3d 787, 793 (2d Cir.1994) (where state court

habeas corpus proceeding could not have provided the plaintiff with the full measure of relief available in subsequent federal proceeding, claim preclusion could not apply, but collateral estoppel might).

the causes of the dissolution, it is nevertheless apparent that a state court *could* apply that standard provided that the state court made it clear that it had considered all of the factors enumerated in Conn.Gen.Stat.Ann. § 46b–82 (West 1986) and did not base the award even in part on any non-support based factor.

As to whether the issue of support was actually litigated—the record of the state court trial will supply the answer. It is noted that when the state court judgment incorporates a stipulation, Connecticut law requires the state court to "inquire into the financial resources and actual needs of the spouses . . . in order to determine whether the agreement . . . is fair and equitable under all the circumstances." Conn.Gen.Stat. Ann. § 46b–66 (West 1986). *See Carter v. Carter (In re Carter),* 138 B.R. 356, 360 (Bankr.D.Conn.1992) (issue was actually litigated where parties to stipulation could reasonably have foreseen the conclusive effect of their actions).

As to the issue of the nature of the support obligation being necessary to the judgment—if the parties in a dissolution proceeding enter into an agreement or the court concludes after hearing evidence on that contested issue that a spouse needs support and that a subsequent bankruptcy should not discharge that obligation, a determination by the court to that effect is essential to its judgment awarding alimony. To hold otherwise would permit one party to deceive the other or unilaterally reject an agreement; undermine the integrity of a state court judge's intent to award alimony after concluding that it is needed; and result in duplicative litigation in bankruptcy court. *See In re Catron, supra,* 164 B.R. at 917 (failing to give effect to the clearly expressed intent of the parties to a separation agreement "would invite profound mischief and encourage parties to divorce proceedings and their counsel to make agreements that do not reflect their true intent or, worse still, that they do not intend to keep."). Of course, agreements or decrees which are tainted by fraud, duress, or similar defects are not within the scope of that conclusion.

## ORDER

For the foregoing reasons, I conclude that the Obligation is not dischargeable under § 523(a)(5), and judgment may enter in favor of the plaintiff. IT IS SO ORDERED.